439 P.2d 266

Gerald J. DYETT, Plaintiff,

v.

John W. TURNER, Warden, Utah State Prison, Defendant.

No. 11089.

Supreme Court of Utah.

March 22, 1968.

Del B. Rowe, Salt Lake City, for plaintiff.

Phil L. Hansen, Atty. Gen., Salt Lake City, for defendant.

ELLETT, Justice:

The plaintiff, Mr. Dyett, is confined in the state prison of the State of Utah as a result of a plea of guilty entered to a charge of issuing a check against insufficient funds with intent to defraud. He filed a petition for a writ of habeas corpus in the Federal District Court here, which was denied. Thereafter he filed an amended petition in the same court. At the time of denying this amended petition the judge wrote a memorandum decision in which he indicated a disposition to release the petitioner from prison but thought he could do so only after all state remedies had been exhausted. He said:

Accordingly, the amended petition for a writ of habeas corpus must be and is hereby denied, without prejudice to the filing of a further petition at such time as plaintiff may have exhausted his state remedies upon the specific claim herein discussed. 28 U.S.C. § 2254.

He further said:

It is clear from the foregoing authorities that plaintiff had a constitutional right to be represented by counsel before the state district court at the time of his plea of guilty and that the facts appearing of record do not establish waiver of that right as a matter of law. Whether an understanding, intelligent and voluntary waiver is shown by a preponderance of the evidence calls for a judgment on the facts on which there now is no record determination by state authority which is controlling upon this court under 28 U.S.C. § 2254 as amended by Pub.L. 89–711, 80 Stat. 1104.

We feel that our decision in this matter should not be subject to reversal by inferior courts of the federal system. However, it is rather obvious that such a proceeding is likely to occur unless we turn the prisoner loose upon society. While we deplore such a situation as is now foisted upon the states by various rulings of the United States Supreme Court and acts of Congress based upon such rulings, yet we want it understood that we do not think the particular Utah federal district judge is in any manner to blame. He acts under the direction of the Supreme Court of the United States and must faithfully carry out the law as he believes that court would have him to do. We personally know him to be one of the finest of men, an excellent lawyer, and a good judge. What we have to say hereafter is not meant as any reflection upon him in any manner whatsoever.

This situation presents an opportunity to review the constitutional provisions in order to determine if any rights of this defendant have been violated.

We first direct our attention to the Sixth Amendment to the Constitution of the United States, which so far as material provides:

> In all criminal prosecutions, *the accused shall enjoy the right* to a speedy and public trial, * * * and *to have the Assistance of Counsel for his defense.* [Emphasis added.]

It does not say he shall have counsel. It only says he shall have the right to have the assistance of counsel for his defense, and the right to have counsel does not justify a court in forcing a lawyer upon an accused who does not want one. See State v. Penderville, 2 Utah 2d 281, 272 P.2d 195; Moore v. State of Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167.

To understand this amendment, one must look to the situation which prevailed at the time of the adoption of the first ten amendments. In England a defendant in a misdemeanor case had the right to have counsel with him in court. A felony charge being initiated by the Crown was looked upon as a different matter, and one accused of felony was not permitted to contest with the Crown by means of a lawyer. In fact, it was not until 1836 that a defendant accused of a felony in England was permitted the right to have counsel in court. See 21 Am.Jur.2d, Criminal Law § 309. It was the fear of the states that the newly created federal entity might attempt to follow the Crown in refusing a defendant the right to have counsel which caused this amendment to be written into the so-called Bill of Rights. This was simply a limitation upon the Federal Government and in nowise was supposed to be applicable to the states. In fact, the Tenth Amendment was adopted to make sure that the federal entity did not take unto itself any powers not specifically granted to it. That amendment reads:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

For over 140 years more than 70 justices of the Supreme Court consistently held that the first ten amendments to the Constitution applied as a limitation to the Federal Government only and not in any manner to the states, and for 70 years following the so-called adoption of the Fourteenth Amendment some 35 justices from every corner of the Nation have held that the Fourteenth Amendment did not make the first ten amendments applicable to the states. Some of those justices had helped to frame the original Constitution and the first ten amendments and had worked to secure the adoption thereof. Others had participated in the war between the states and were acquainted at firsthand with the purposes intended to be accomplished by the Fourteenth Amendment. All of them interpreted the Constitution, including the amendments, with knowledge and wisdom born of intimacy with the problems which had called forth the documents in the first place.

The United States Supreme Court, as at present constituted, has departed from the Constitution as it has been interpreted from its inception and has followed the urgings of social reformers in foisting upon this Nation laws which even Congress could not constitutionally pass. It has amended the Constitution in a manner unknown to the document itself. While it takes three fourths of the states of the Union to change the Constitution legally, yet as few as five men who have never been elected to office can by judicial fiat accomplish a change just as radical as could three fourths of the states of this Nation. As a result of the recent holdings of that Court, the sovereignty of the states is practically abolished, and the erst while free and independent states are now in effect and purpose merely closely supervised units in the federal system.

We do not believe that justices of once free and independent states should surrender their constitutional powers without being heard from. We would betray the trust of our people if we sat supinely by and permitted the great bulk of our powers to be taken over by the federal courts without at least stating reasons why it should not be so. By attempting to save the dual relationship which has heretofore existed between state and federal authority and which is clearly set out in the Constitution, we think we act in the best interest of our country.

We feel like galley slaves chained to our oars by a power from which we cannot free ourselves, but like slaves of old we think we must cry out when we can see the boat heading into the maelstrom directly ahead of us; and by doing so, we hope the master of the craft will heed the call and avert the

dangers which confront us all. But by raising our voices in protest we, like the galley slaves of old, expect to be lashed for doing so. We are confident that we will not be struck by 90 per cent of the people of this Nation who long for the return to the days when the Constitution was a document plain enough to be understood by all who read it, the meaning of which was set firmly like a jewel in the matrix of common sense and wise judicial decisions. We shall not complain if those who berate us belong to that small group who refuse to take an oath that they will not overthrow this government by force. When we bare our legal backs to receive the verbal lashes, we will try to be brave; and should the great court of these United States decide that in our thinking we have committed error, then we shall indeed feel honored, for we will then be placed on an equal footing with all those great justices who at this late date are also said to have been in error for so many years.

In addition to what we have said about the meaning of the Federal Constitution, we are disturbed in the attitude of the criminal element in our society since the federal courts have arrogated unto themselves the powers and duties which rightfully belong to the state courts. It is a daily occurrence when some known burglar or thief flouts a police officer and threatens to "get his badge," and threatens the trial judge with having him taken before the judge of the federal court.

For many years Utah has been at the very head of our states in the Union in the matter of rehabilitation of prisoners. Our efforts have been directed toward teaching the wayfaring man to cease to do evil and to learn to do good. We have 20 trial judges, and everyone of them utilizes probation personnel in trying to supervise defendants who are placed on probation. In all of our 29 counties, some of which are sparsely inhabited, we have the services of trained men who are instrumental in securing employment for the defendants and of giving them "on-the-job training."

The records of the Adult Probation and Parole Board show that some 63 per cent of all defendants who are either found guilty or who plead guilty are placed on probation, and of that number 75 per cent are faithful to their probationary obligations. Those records further show that of those more hardened criminals who are first committed to prison and then placed on parole, over 62 per cent keep faith with their trust. Always the welfare of the man is the principal objective in the attempt to make useful citizens out of prisoners. We have an accredited high school within the prison walls from which one may graduate and receive a high school diploma recognized by all colleges as a basis of entrance. Trades are taught inmates, such, for example, as welding, painting, carpentry, upholstery, auto

mechanics, boiler making, cooking, printing, etc.

The prime prerequisite toward a good relationship between a prisoner and his rehabiliation is his acknowledgment and acceptance of the fact that he has done wrong and a realization on his part that society is his benefactor trying to improve his lot so that he can become a useful citizen. It is difficult to supervise a man who is looking for loopholes through which he may escape from the results of his criminal tendencies. Each time he is let out on a technicality, he believes the court is on his side, and so he does not have to conform to any standard except that which he sets for himself. A constant stream of writs of habeas corpus flows from the prison daily, complaining about the lack of beefsteak and pie and other frivolous matters. Suits are filed against judges who, in the performance of their duties, sentence criminals to prison, etc.

The Board of Pardons have been liberal in placing men on parole who give promise of reform, but they do this only because they let it be understood that misbehavior on the prisoner's part will result in termination of the trial parole. Holdings to the effect that parole cannot be revoked without a full hearing with state-appointed counsel will simply cause the board to be more reluctant to release a prisoner in the future. The decisions of the United States courts have in effect invited and caused prisoners to look for technicalities of how to "get out of it" or "to beat the rap."

The time was when a lawyer could counsel his client to plead guilty and receive supervision and training, so that he might be a better citizen when he had paid his debt to society. Such advice came from honest lawyers who thought more of the future of the defendant than they did of getting a guilty man off. No longer can an attorney safely do that, for to do so will likely result in a release of the prisoner on habeas corpus upon the ground that the lawyer was incompetent and had not put the state to as much expense as possible.

It has been intimated that a rich man can hire a loophole lawyer, and it is, therefore, a denial of due process to fail to furnish a poor man a loophole lawyer also. The answer seems to be that courts should make an example of loophole lawyers wherever they may be found—if any there be. If courts would direct attention to seeing that innocent men are not found guilty or allowed to plead guilty rather than trying to find imaginary legal technicalities which allow the guilty to escape punishment, the stature of the courts and of lawyers would rise immensely in the eyes of the public.

In regard to the Fourteenth Amendment, which the present Supreme Court of the United States has by decision chosen as the basis for invading the rights and pre-

rogatives of the sovereign states, it is appropriate to look at the means and methods by which that amendment was foisted upon the Nation in times of emotional stress. We have no desire at this time to have the Fourteenth Amendment declared unconstitutional. In fact, we are not asked to do that. We merely want to show what type of a horse that Court has to ride in order to justify its usurpation of the prerogatives of the states.

It is common knowledge that any assumption of power will always attract a certain following, and if no resistance is offered to this show of strength, then the asserted powers are accepted without question. It is therefore our purpose to try to give a ray of hope to all those who believe that the states are capable of deciding for themselves whether prayer shall be permitted in schools, whether their bicameral legislatures may be composed of members elected pursuant to their own state constitutional standards, yes, and even whether a prisoner who says he does not want counsel shall be turned loose because the court did not tell him that he could have one for free.

The method of amending the Federal Constitution is provided for in Article V of the original document. No other method will accomplish this purpose. That article provides as follows:

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress;
* * *

The Civil War had to be fought to determine whether the Union was indissoluble and whether any state could secede or withdraw therefrom. The issue was settled first on the field of battle by force of arms, and second by the pronouncement of the highest court of the land. In the case of State of Texas v. White, 7 Wall. 700, 19 L.Ed. 227, it was claimed that Texas having seceded from the Union and severed her relationship with a majority of the states of the Union, and having by her ordinance of secession attempted to throw off her allegiance to the Constitution of the United States, had thus disabled herself from prosecuting a suit in the federal courts. In speaking on this point the Court at page 726, 19 L.Ed. 227 held:

When, therefore, Texas became one of the United States, she entered into an indissoluble relation. All the obligations of perpetual union, and all the guaranties

of republican government in the Union, attached at once to the State. The act which consummated her admission into the Union was something more than a compact; it was the incorporation of a new member into the political body. And it was final. The union between Texas and the other States was as complete, as perpetual, and as indissoluble as the union between the original States. There was no place for reconsideration, or revocation, except through revolution, or through consent of the States.

Considered therefore as transactions under the Constitution, the ordinance of secession, adopted by the convention and ratified by a majority of the citizens of Texas, and all the acts of her legislature intended to give effect to that ordinance, were absolutely null. They were utterly without operation in law. The obligations of the State, as a member of the Union, and of every citizen of the State, as a citizen of the United States, remained perfect and unimpaired. It certainly follows that the State did not cease to be a State, nor her citizens to be citizens, of the Union. If this were otherwise, the State must have become foreign, and her citizens foreigners. The war must have ceased to be a war for the suppression of rebellion, and must have become a war for conquest of subjugation.

Our conclusion therefore is, that Texas continued to be a State, and a State of the Union, notwithstanding the transactions to which we have referred. And this conclusion, in our judgment, is not in conflict with any act or declaration of any department of the National government, but entirely in accordance with the whole series of such acts and declarations since the first outbreak of the rebellion.

It is necessary to review the historical background to understand how the Fourteenth Amendment came to be a part of our Federal Constitution.

General Lee had surrendered his army on April 9, 1865, and General Johnston surrendered his 17 days later. Within a period of less than six weeks thereafter, not one Confederate soldier was bearing arms. By June 30, 1865, the Confederate states were all restored by presidential proclamation to their proper positions as states in an indissoluble union,[1] and practically all citizens thereof[2] had been granted amnesty.

---

1. 13 Stat. 760, 763, 764, 765, 767, 768, 769, 771 (1865).
2. 13 Stat. 758 (1865). A few citizens were excepted from the amnesty proclamation, such, for example, as civil or diplomatic officers of the late confederate government and all of the seceding states; United States judges, members of Congress and commissioned officers of the United States Army and Navy who left their posts to aid the rebellion; officers in the Confederate military forces above the rank of colonel in the Army and lieutenant in the Navy; all who resigned commissions in the Army or Navy of the United States to assist the re-

Immediately thereafter each of the seceding states functioned as regular states in the Union with both state and federal courts in full operation.

President Lincoln had declared the freedom of the slaves as a war measure, but when the war ended, the effect of the proclamation was ended, and so it was necessary to propose and to ratify the Thirteenth Amendment in order to insure the freedom of the slaves.

The 11 southern states having taken their rightful and necessary place in the indestructible Union proceeded to determine whether to ratify or reject the proposed Thirteenth Amendment. In order to become a part of the Constitution, it was necessary that the proposed amendment be ratified by 27 of the 36 states. Among those 27 states ratifying the Thirteenth Amendment were 10 from the South, to wit, Louisiana, Tennessee, Arkansas, South Carolina, Alabama, North Carolina, Georgia, Mississippi, Florida, and Texas.

When the 39th Congress assembled on December 5, 1865, the senators and representatives from the 25 northern states voted to deny seats in both houses of Congress to anyone elected from the 11 southern states. The full complement of senators from the 36 states of the Union was 72, and the full membership in the House was 240. Since it requires only a majority vote (Article I, Section 5, Constitution of the United States) to refuse a seat in Congress, only the 50 senators and 182 congressmen from the North were seated. All of the 22 senators and 58 representatives from the southern states were denied seats.

Joint Resolution No. 48 proposing the Fourteenth Amendment was a matter of great concern to the Congress and to the people of the Nation. In order to have this proposed amendment submitted to the 36 states for ratification, it was necessary that two thirds of each house concur. A count of noses showed that only 33 senators were favorable to the measure, and 33 was a far cry from two thirds of 72 and lacked one of being two thirds of the 50 seated senators.

While it requires only a majority of votes to refuse a seat to a senator, it requires a two thirds majority to unseat a member once he is seated. (Article 1, Section 5, Constitution of the United States) One John P. Stockton was seated on December 5, 1865, as one of the senators from New Jersey. He was outspoken in his opposition to Joint Resolution No. 48 proposing the Fourteenth Amendment. The leadership in the Senate not having control of two thirds of the seated senators voted to refuse to seat Mr. Stockton upon the ground that he had received only a plurality and not a

bellion; and all officers of the military forces of the Confederacy who had been

educated at the military or naval academy of the United States, etc., etc.

majority of the votes of the New Jersey legislature. It was the law of New Jersey and several other states that a plurality vote was sufficient for election. Besides, the Senator had already been seated. Nevertheless, his seat was *refused,* and the 33 favorable votes thus became the required two thirds of the 49 members of the Senate.

In the House of Representatives it would require 122 votes to be two thirds of the 182 members seated. Only 120 voted for the proposed amendment, but because there were 30 absententions it was declared to have been passed by a two thirds vote of the House.

Whether it requires two thirds of the full membership of both houses to propose an amendment to the Constitution or only two thirds of those seated or two thirds of those voting is a question which it would seem could only be determined by the United States Supreme Court. However, it is perhaps not so important for the reason that the amendment is only *proposed* by Congress. It must be *ratified* by three fourths of the states in the Union before it becomes a part of the Constitution. The method of securing the passage through Congress is set out above, as it throws some light on the means used to obtain ratification by the states thereafter.

Nebraska had been admitted to the Union, and so the Secretary of State in transmitting the proposed amendment announced that ratification by 28 states would be needed before the amendment would become part of the Constitution, since there were at the time 37 states in the Union. A rejection by 10 states would thus defeat the proposal.

By March 17, 1867, the proposed amendment had been ratified by 17 states and rejected by 10, with California voting to take no action thereon, which was equivalent to rejection. Thus the proposal was defeated.

One of the ratifying states, Oregon, had ratified by a membership wherein two legislators were subsequently held not to be duly elected, and after the contest the duly elected members of the legislature of Oregon rejected the proposed amendment. However, this rejection came after the amendment was declared passed.

Despite the fact that the southern states had been functioning peacefully for two years and had been counted to secure ratification of the Thirteenth Amendment, Congress passed the Reconstruction Act, which provided for the military occupation of 10 of the 11 southern states. It excluded Tennessee from military occupation, and one must suspect it was because Tennessee had ratified the Fourteenth Amendment on July 7, 1866. The Act further disfranchised practically all white voters and provided that no senator or congressman from the occupied states could be seated in

Congress until a new constitution was adopted by each state which would be approved by Congress, and further provided that each of the 10 states must ratify the proposed Fourteenth Amendment, and the Fourteenth Amendment must become a part of the Constitution of the United States before the military occupancy would cease and the states be allowed to have seats in Congress.

By the time the Reconstruction Act had been declared to be the law, three more states had ratified the proposed Fourteenth Amendment, and two—Louisiana and Delaware—had rejected it. Then Maryland withdrew its prior ratification and rejected the proposed Fourteenth Amendment. Ohio followed suit and withdrew its prior ratification, as also did New Jersey. California, which earlier had voted not to pass upon the proposal, now voted to reject the amendment. Thus 16 of the 37 states had rejected the proposed amendment.

By spurious, nonrepresentative governments seven of the southern states which had theretofore rejected the proposed amendment under the duress of military occupation and of being denied representation in Congress did attempt to ratify the proposed Fourteenth Amendment. The Secretary of State on July 20, 1868, issued his proclamation wherein he stated that it was his duty under the law to cause amendments to be published and certified as a part of the Constitution when he received official notice that they had been adopted pursuant to the Constitution. Thereafter his certificate contained the following language:

And whereas neither the act just quoted from, nor any other law, expressly or by conclusive implication, authorizes the Secretary of State to determine and decide doubtful questions as to the authenticity of the organization of State legislatures, or as to the power of any State legislature to recall a previous act or resolution of ratification of any amendment proposed to the Constitution;

And whereas it appears from official documents on file in this Department that the amendment to the Constitution of the United States, proposed as aforesaid, has been ratified by the legislatures of the States of [naming 23, including New Jersey, Ohio, and Oregon];

And whereas it further appears from documents on file in this Department that the amendment to the Constitution of the United States, proposed as aforesaid, has also been ratified by newly constituted and newly established bodies avowing themselves to be and acting as the legislatures, respectively, of the States of Arkansas, Florida, North Carolina, Louisiana, South Carolina, and Alabama;

And whereas it further appears from official documents on file in this Department that the legislatures of two of the States first above enumerated, to wit,

Ohio and New Jersey, have since passed resolutions respectively withdrawing the consent of each of said States to the aforesaid amendment; and whereas it is deemed a matter of doubt and uncertainty whether such resolutions are not irregular, invalid, and therefore ineffectual for withdrawing the consent of the said two States, or of either of them, to the aforesaid amendment;

And whereas the whole number of States in the United States is thirty-seven, to wit: [naming them];

And whereas the twenty-three States first hereinbefore named, whose legislatures have ratified the said proposed amendment, and the six States next thereafter named, as having ratified the said proposed amendment by newly constituted and established legislative bodies, together constitute three fourths of the whole number of States in the United States;

Now, therefore, be it known that I, WILLIAM H. SEWARD, Secretary of State of the United States, by virtue and in pursuant of the second section of the act of Congress, approved the twentieth of April, eighteen hundred and eighteen, hereinbefore cited, do hereby certify that if the resolutions of the legislatures of Ohio and New Jersey ratifying the aforesaid amendment are to be deemed as remaining of full force and effect, notwithstanding the subsequent resolutions of the legislatures of those States, which purport to withdraw the consent of said States from such ratification, then the aforesaid amendment has been ratified in the manner hereinbefore mentioned, and so has become valid, to all intents and purposes, as a part of the Constitution of the United States.[3]

Congress was not satisfied with the proclamation as issued and on the next day passed a concurrent resolution wherein it was resolved "That said fourteenth article is hereby declared to be a part of the Constitution of the United States, and it shall be duly promulgated as such by the Secretary of State."[4] Thereupon, William H. Seward, the Secretary of State, after setting forth the concurrent resolution of both houses of Congress, then certified that the amendment "has become valid to all intents and purposes as a part of the Constitution of the United States."[5]

The Constitution of the United States is silent as to who should decide whether a proposed amendment has or has not been passed according to formal provisions of Article V of the Constitution. The Supreme Court of the United States is the ultimate authority on the meaning of the Con-

---

3. 15 Stat. 707 (1868).
4. Resolution set forth in proclamation of Secretary of State, 15 Stat. 709 (1868).

See also U.S.C.A., Amends. 1 to 5, Constitution, p. 11.
5. 15 Stat. 708 (1868).

stitution and has never hesitated in a proper case to declare an act of Congress unconstitutional—except when the act purported to amend the Constitution.[6] The duty of the Secretary of State was ministerial, to wit, to count and determine when three fourths of the states had ratified the proposed amendment. He could not determine that a state once having rejected a proposed amendment could thereafter approve it, nor could he determine that a state once having ratified that proposal could thereafter reject it. The court and not Congress should determine such matters. Consistency would seem to require that a vote once cast would be final or would not be final, whether the first vote was for ratification or rejection.

In order to have 27 states ratify the Fourteenth Amendment, it was necessary to count those states which had first rejected and then under the duress of military occupation had ratified, and then also to count those states which initially ratified but subsequently rejected the proposal.

To leave such dishonest counting to a fractional part of Congress is dangerous in the extreme. What is to prevent any political party having control of both houses of Congress from refusing to seat the opposition and then without more passing a joint resolution to the effect that the Constitution is amended and that it is the duty of the Administrator of the General Services Administration[7] to proclaim the adoption? Would the Supreme Court of the United States still say the problem was political and refuse to determine whether constitutional standards had been met?

How can it be conceived in the minds of anyone that a combination of powerful states can by force of arms deny another state a right to have representation in Congress until it has ratified an amendment which its people oppose? The Fourteenth Amendment was adopted by means almost as bad as that suggested above.[8]

We have spoken in the hope that the Supreme Court of the United States may retreat from some of its recent decisions af-

6. In the case of Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505, the question was before the Supreme Court as to whether or not the Nineteenth Amendment had been ratified pursuant to the Constitution. In the last paragraph of the decision the Supreme Court said: " * * * As the legislatures of Tennessee and of West Virginia had power to adopt the resolutions of ratification, official notice to the Secretary, duly authenticated, that they had done so, was conclusive upon him, and, being certified to by his proclamation, is conclusive upon the courts. * * * "

7. 65 Stat. 710, § 106b (1951), designates the Administrator of General Services Administration as the one whose duty it is to certify that an amendment has been ratified.

8. For a more detailed account of how the Fourteenth Amendment was forced upon the Nation, see articles in 11 S.C.L.Q. 484 and 28 Tul.L.Rev. 22.

fecting the rights of a sovereign state to determine for itself what is proper procedure in its own courts as it affects its own citizens. However, we realize that because of that Court's superior power, we must pay homage to it even though we disagree with it; and so we now discuss the merits of this case just the same as though the sword of Damocles did not hang over our heads.

We have only one question to decide: Did the defendant below (the plaintiff in this petition) knowingly, intelligently, and voluntarily waive counsel? Let us look at the record of what he said at the time he waived counsel.

THE COURT: Do you understand that this charge carries with it a penalty of imprisonment in the Utah State Prison?

DEFENDANT DYETT: Yes, sir.

THE COURT: Do you have a prior record?

DEFENDANT DYETT: No, sir.

THE COURT: Do you have an attorney?

DEFENDANT DYETT: No, sir.

THE COURT: Do you desire to be represented by counsel?

DEFENDANT DYETT: No, sir.

THE COURT: Do you understand that you are entitled to be represented by counsel?

DEFENDANT DYETT: Yes.

THE COURT: Is it your desire to waive counsel?

DEFENDANT DYETT: Yes, sir.

THE COURT: Are you free on bail?

DEFENDANT DYETT: Yes.

THE COURT: The record may show that the defendant has waived his right to counsel.

The Statute allows you additional time before you are required to enter a plea, or you may waive that time and enter a plea at this time. What is your desire?

DEFENDANT DYETT: I will waive.

THE COURT: You waive your time?

DEFENDANT DYETT: Yes.

THE COURT: And enter a plea now?

DEFENDANT DYETT: Yes.

THE COURT: To the charge of issuing a check against insufficient funds, how do you plead, guilty or not guilty?

DEFENDANT DYETT: I plead guilty, and request a probationary—

THE COURT: Have you conferred with an attorney?

DEFENDANT DYETT: No.

THE COURT: Why do you think you are entitled to probation?

DEFENDANT DYETT: Well, I don't know why. It's just my wishes, probationary.

At the time of arraignment the Court asked the defendant why he wrote the check, and the defendant answered, "Well, just didn't have any money, and I wrote it. That's all there is to it." He also said he had written other checks which had not been paid for. The prosecuting attorney had six of the worthless checks which had been turned over to the sheriff by merchants who had been defrauded.

The defendant was not shown to be illiterate or feeble minded. He was guilty and knew it and also knew that the State could prove it. He did not want either a trial or a lawyer. One would have to stretch his imagination to find that this defendant did want a lawyer. So much notoriety has been given to the right to counsel on the part of defendants charged with criminal acts that it is difficult to believe any grown man who is smart enough to defraud seven merchants into cashing worthless checks would not know about it.

In the case of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357, it was said:

It must be remembered, however, that a judgment cannot be lightly set aside by collateral attack, even on *habeas corpus*. When collaterally attacked, the judgment of a court carries with it a presumption of regularity. Where a defendant, without counsel, acquiesces in a trial resulting in his conviction and later seeks release by the extraordinary remedy of *habeas corpus*, the burden of proof rests upon him to establish that he did not competently and intelligently waive his constitutional right to assistance of Counsel.

In the case of Cost v. Boles, D.C., 272 F. Supp. 39, the prisoner had been convicted in a state court and brought habeas corpus in a federal court. He testified that the trial court asked him if he wanted counsel but he did not understand this to mean that if he could not afford an attorney, one would be appointed for him. In dismissing the prisoner's petition the court at page 43 said:

* * * the Court feels that the question of whether a defendant "wants" counsel "fairly implies the availability of the assistance of the court in obtaining counsel if he wished it." Starks v. United States, 264 F.2d 797, 800 (4 Cir. 1959). And see Post v. Boles, 332 F.2d 738, 740 (4 Cir. 1964). Thus, the Court feels that the State has borne its initial burden of proving Cost's "affirmative acquiescence" in proceeding without counsel.

The case of State v. Gilbert, 78 N.M. 437, 432 P.2d 402 (1967), involved an attempt by a prisoner to get out of prison on a writ of habeas corpus on the ground that he did not understandingly and intelligently waive his right to counsel. The Supreme Court of New Mexico held that proceedings under the post-conviction remedies were civil in nature and, therefore, governed by

the Rules of Civil Procedure. The court said:

> Thus the burden of proof at the Rule 93 hearing rested on defendant to establish that he did not competently and intelligently waive his right to counsel, and this burden required him to so convince the court by a preponderance of the evidence. [Citations omitted.] He failed to meet this burden, and we are of the opinion that the evidence substantially supports the findings of the trial court.

The case of Nielsen v. Turner, 20 Utah 2d 181, 435 P.2d 921, is on all fours with the instant case, and in that case relief was denied to the petitioner.

We can see no reason to start talking about who is going to pay a lawyer until somebody wants one. In fact, it should be remembered that all the court can do is to appoint a lawyer to work for the client. It is not the province of the judge to make him do it for free. That could be taking property without due process of law. The defendant who commits a crime is entitled to have counsel, but he is not entitled to a free ride at the expense of the public upon whom he has just been preying. The widow and the orphan whose breadwinner has been murdered in cold blood should not be taxed to help the guilty defendant escape the consequences of his evil deed. He at least should pay the lawyer for the services rendered if he ever becomes able to do so. The lawyer under his oath will perform just as faithfully on credit as he will for cash. For a court to say that a lawyer will not be faithful to his client who has not paid the fee in advance is but a reflection upon the standard of ethics of that particular court. It would not say that when a doctor operates on a patient who cannot pay, the patient will not receive the best the doctor can give, and it ill becomes a judge—who theoretically is an ex-lawyer—to say that the lawyer is not as loyal to his client as the surgeon is to his patient. We are not acquainted with any lawyer who would not put forth his best efforts in behalf of his client simply because he had not been paid for his services.

This plaintiff (defendant below) is guilty and admits it. He said he did not want a lawyer, and we should respect his wish.

By bringing the instant writ of habeas corpus before this court, the petitioner has elected to rely upon the record, since evidence cannot be presented in testimonial form before this court. It seems clear to us that he knowingly and intelligently waived counsel, and we, therefore, deny his petition.

CALLISTER, J., concurs in the result.

HENRIOD, J., concurs in the result and reasoning.

CROCKETT, Chief Justice (concurring in the result):

**418**

I concur in the order denying the petitioner's release on the ground that in lawful and orderly proceedings he stands convicted and sentenced of the crime for which he is imprisoned; and as is stated near the conclusion of Justice Ellett's opinion this case "is on all fours" with the case of Nielsen v. Turner, 20 Utah 2d 181, 435 P.2d 921. See also Syddall v. Turner, 20 Utah 2d 263, 437 P.2d 194, and State v. Workman, 20 Utah 2d 178, 435 P.2d 919, recently decided by this court.

TUCKETT, J., concurs in the concurring opinion of CROCKETT, C. J.