473 P.2d 887

Dorris CYPERT, Plaintiff and Respondent,

v.

WASHINGTON COUNTY SCHOOL DIS-
TRICT et al., Defendants
and Appellants.

No. 12071.

Supreme Court of Utah.

July 16, 1970.

John W. Palmer, St. George, for defendants appellants.

H. R. Waldo, Jr., of Jones, Waldo, Holbrook & McDonough, Salt Lake City, for plaintiff-respondent.

CROCKETT, Chief Justice.

Plaintiff as a qualified voter, but one who pays no property tax, (on her own behalf and allegedly for others similarly situated) sued to enjoin the defendant, Washington County School District, from proceeding with an issue of $1,000,000 general obligation bonds, approved at a bond election held May 27, 1969, at which only voters who had paid property tax in the District within the previous year were allowed to vote; and to declare invalid the provisions of Section 3, Article XIV, Utah Constitution, and Sections 11–14–2 and 11–14–5, U.C.A. 1953, insofar as they require such voters to have paid a property tax in the district within 12 months preceding the election. After a plenary trial the district court rendered judgment in accordance with plaintiff's contentions; and further declared that the provisions of the Utah Constitution and law just referred to, requiring voters in a bond election to be taxpayers, are severable from the remainder of such sections, so that the school district may validly hold bond elections if all otherwise qualified voters are allowed to vote. Defendant School District appeals, challenging the injunction and the judgment.

The basis of the plaintiff's attack upon the bond election, and of the trial court's ruling, is certain rulings of the Supreme Court of the United States which have but recently innovated into the law an invalidation of requirements that only voters who

pay property taxes can vote.[1] The case of the City of Phoenix v. Kolodziejski deals with general obligation bonds similar to our case. The United States Supreme Court in a split decision, five to three,[2] held the requirement that only voters who paid property taxes could vote to be invalid. Although we are in emphatic disagreement with that decision, about which we have something to say below, we proceed upon the assumption that upon the issue mentioned it is controlling in this case. Nevertheless, under the express language of that case there is a procedural reason why the particular bond issue challenged here is to be deemed valid and not subject to attack: That decision said in part:

[O]ur decision in this case will apply only to authorizations for general obligation bonds which are not final as of June 23, 1970, the date of this decision. In the case of States authorizing challenges to bond elections within a definite period, *all elections held prior to the date of this decision will not be affected by this de-cision unless a challenge on the grounds sustained by this decision has been or is brought within the period specified by state law.* [Supra, at 1996, 90 S.Ct. at 1996.]

The "period specified by state law" in our State is contained in Sec. 11-14-12, U. C.A.1953, which states in part:

When the validity of any bond election is contested, the plaintiff or plaintiffs must, *within forty days* after the returns of the election are canvassed and the results thereof declared, file with the clerk of the district court * * *, a verified written complaint setting forth specifically:

*     *     *     *     *     *

(3) The particular grounds of such contest. *No such contest shall be maintained and no bond election shall be set aside or held invalid unless such a complaint is filed within the period prescribed in this section.*

---

1. In Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed. 2d 583 (1969), the court held that a New York statute denied equal protection of the law by limiting the voting franchise in *school district elections* to those who pay property taxes or have children in school in the district and was therefore unconstitutional. Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), held that a Louisiana statute was unconstitutional as denying equal protection of the law by limiting the voting franchise to "property tax-payers" in bond elections to approve the issuance of *revenue bonds.* City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (June 1970), (hereinafter referred to as the Phoenix case), held unconstitutional the provisions of Arizona constitution and statutes limiting the voting franchise to property tax-payers in bond elections to approve the issuance of *general obligation bonds.*

2. Thus, actually a majority of five on a nine-justice court, Justice Blackmun not participating.

■ In this case the election had been held on May 27, 1969, and the results had been canvassed and officially declared on June 3, 1969. Thus the election had been "held prior to the date of this decision" (City of Phoenix, supra, June 23, 1970); and inasmuch as the plaintiff's complaint was not filed until December 4, 1969, thus 211 days after the results had been officially declared, there was no "challenge on the grounds sustained by this decision * * * brought within the period specified by state law," i. e., within 40 days. Consequently, under any view that may be taken of the law and the cases above referred to, the bond election challenged herein is final and incontestable by the express statement of the Phoenix case and must be deemed to be valid. In that respect the judgment of the district court is reversed.

Nevertheless, in view of the expressed desire of the parties, and of the importance to the public, of having this court give its answer to the question as to the validity of a bond election held in accordance with the provisions of Section 3, Article XIV, of the Utah Constitution, and Secs. 11–14–2 and 5, U.C.A.1953, in the light of the above mentioned recent developments in the law, we proceed to further treat that problem.[3]

■■ Notwithstanding our emphatic disagreement with the majority in the Phoenix case, we realize that it is for the present to be recognized as the law; and that as such it renders those aspects of Section 3 of Article XIV of our State Constitution, and Sections 11–14–2 and 5, U.C.A.1953, inoperable insofar as they require that only property taxpayers be permitted to vote in such bond elections. We further observe that this should have no effect whatsoever in nullifying or limiting any other aspect of those provisions of the law. In other words, it is our opinion that the aspect of those provisions just referred to as having been rendered inoperable, are severable from the other aspects of the aforesaid provisions of our State Constitution and statutes, so that bond elections may be held and bonds may be issued by cities, towns, counties, school districts, or other authorized public entities at a proper election participated in by all qualified voters; and without the latter being limited to those paying property taxes.[4]

3. That a court will decide a moot case or determine a moot question where it appears to be in the public interest to do so, see People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 30 A.L.R. 2d 1132, cert. den. 344 U.S. 824, 73 S. Ct. 24, 97 L.Ed. 642; Lloyd v. Bd. of Supervisors, 206 Md. 36, 111 A.2d 379; Lawyers Assn. of St. Louis v. St. Louis, (Mo.App.) 294 S.W.2d 676; 20 Am.Jur. 2d, Courts, Sec. 81, footnote 18.

4. As to severability see Smith v. Carbon County, 95 Utah 340, 81 P.2d 370; Stillman v. Lynch, 56 Utah 540, 192 P. 272, 12 A.L.R. 552; Riggins v. District Court, 89 Utah 183, 51 P.2d 645; 16 Am.Jur. 2d 409.

The foregoing conclusion is a necessary and coerced recognition of what in our judgment is the totally erroneous ruling by the majority of the Supreme Court of the United States in the Phoenix case, supra. We decry that decision as an unwarranted overreaching beyond any possible area of their concern and as a departure from proper regard for the principle of judicial restraint. It intrudes into the legislative function; and also into areas which are exclusively the concern of the State. Moreover, the decision is entirely void of any correct basis in principle, or in logic, or in legal precedent.

The Constitution of Utah was approved in appropriate procedures by the people of this State in their Constitutional Convention; and more importantly, by the people of the United States through their duly elected Congress in connection with the adoption of the Enabling Act admitting Utah to the Union.[5] It included this language of unmistakable clarity:

> * * * No debt in excess of the taxes for the current year shall be created by * * * any school district * * * unless the proposition to create such debt, shall have been submitted *to a vote of such qualified electors as shall have paid a property tax therein*, in the year preceding such election, * * *

This has stood as the law and has served well its purpose for the 74 years since our statehood. This deviative Phoenix decision now has the effect of squarely nullifying that provision. That this abrupt repudiation of a long-standing requirement of our Constitution and statutes is a legislative change is made completely apparent by the majority decision itself in designating the "effective date" after which it is declared to be operative.

It is understandable that where the voting in elections may in some manner directly or indirectly affect the federal government or its interests, it might conceivably become a concern of the federal courts under rights assured by the Fourteenth Amendment. But we utterly fail to see how it can be their legitimate concern as to how the citizenry of the State of Utah, acting in conformity with the plainly expressed provisions of their duly adopted State Constitution and implementing statutes, manage their own financing programs which involve what is in effect the placing of liens upon the property of their taxpayers. This is so because the right to vote is governed by statute.[6] The reaching out through the "equal protection" clause to grasp this issue into their ambit is misguided and unjustified because, as discussed below, there is a significant dif-

---

5. Approved, July 16, 1894 (28 Stat. 107).

6. See Breedlove v. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252; 25 Am.Jur. 2d 744, Elections, Sec. 54.

ference between the two classes of voters we are dealing with in this case, those who are property taxpaying voters, and those who are not.

The majority opinion in the Phoenix case postulates some foundations for itself which are patently indefensible. It refers to the payment of sales taxes, income taxes and other indirect means such as the payment of rent, by the voters who pay no property tax, by which they indirectly contribute to the payment of such bonds, from which it draws this conclusion:

> Not only do those persons excluded from the franchise have a great interest in approving or disapproving municipal improvements, *but they will also contribute, as directly as property owners,* to the servicing of the bonds by the payment of taxes to be used for this purpose. [Supra, 399 U.S. at p. 210, 90 S.Ct. at 1994.]

It is submitted that upon even the most cursory analysis the foregoing statement will be seen to be clearly fallacious. It completely ignores the true effect of the general obligation bond under which the *property* in the district is subject to taxation to pay the bonds. There is therefore a potential lien upon the property of the taxpaying property holders in the district, as a result of which their property may be foreclosed and sold. This was honestly and forthrightly recognized and pointed out in

the dissenting opinion of Mr. Justice Stewart in the Phoenix case:

> During the entire life of the bonds the privately owned real property in the city is burdened by the city's pledge—and statutory obligation—to use its real estate taxing power for the purpose of repaying both interest and principal under the bond obligation. [Supra, 399 U.S. at p. 217, 90 S.Ct. at 1998.]

Related to the above, this observation is to be made as to the fallacy of the statement that " * * * they [nonpayers of property tax] will also contribute, as directly as property owners, to the servicing of the bonds * * *." In addition to having their property responsible as guaranteeing the payment of the bonds, it must be assumed that, on the average, property taxpayers make the same amount in the various indirect contributions to the school financing program. Furthermore, it should be kept in mind that whatever indirect contributions voters who pay no property tax may be making to the school financing program, they are foot-loose and fancy-free at any time they choose to leave and rid themselves of any responsibility. Whereas, the opposite is true of the property taxpaying voter. He has deeper roots in the district and is not free to leave. Even if he desires to do so, he cannot take his real property with him. Nor can he liquidate and receive the full value thereof, because

it is burdened with the obligation of guaranteeing payment of the bonds.

It is mystifying indeed to search for a basis upon which any fair-minded individual could make a statement as obviously unsound as the assertion in the majority opinion in the Phoenix case that: "there is no basis for concluding that nonproperty owners are substantially less interested in the issuance of these securities than are property owners." Equally without justification is the statement therein that: "The differences between the interests of property owners and the interests of nonproperty owners are not sufficiently substantial to justify excluding the latter from the franchise."

In order to justify their declarations above quoted it would be necessary for the majority of that court to make a satisfactory answer to this question: If it be true that the nontaxpayers contribute "as directly as property owners" to the servicing of the bonds, why is it so necessary that the bonds be general obligation bonds? The answer is obvious and inescapable: It is in order to make them salable; and they are salable because there stands behind them the power and the agreement for the levying of taxes upon the *property* within the district to guarantee their payment. Anyone who will take an honest and realistic look at such a financing plan, and consider a comparison between a bond issue without such a "general ob-

ligation" feature and one with it, will see very clearly that it is this power to tax the property in the district as the ultimate guarantee behind the bonds that makes such a project feasible. Whereas, if the bond issue were only to be paid through the indirect sources, as from those who pay no property tax, the bond purchasers would only be general creditors, without security. The result would be that the bonds would not be salable, nor the financing project feasible. It requires no further elaboration to show beyond peradventure of doubt that the taxpayers and their property have a very substantial commitment beyond those who are *not* such property taxpayers, and to demonstrate the complete unsoundness of the statement that the latter, "contribute as directly as property owners."

In considering the Phoenix case referred to above and the effect it has upon our law, we are led to wonder what has become of the declarations in our United States Constitution about the limitations upon the powers of the federal government and the preservation of them to the states and the people. In Amendment IX it is declared that:

> The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

And in Amendment X that:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

Those commitments which then seemed so important to the creators of our government, and which were formulated, agreed upon, and adopted after great deliberation, seem to have been swallowed up and forgotten in a morass of ever-increasing federal encroachments upon the sovereignty of the states and the rights of their citizenry to manage and govern within the sphere of their own legitimate interests.

We think it is appropriate to here observe that in our system of government the judiciary is possessed of an awesome power and therefore of an awesome responsibility. In addition to its duty of judging individual controversies, it also judges the extent of the power and prerogatives of the other branches of government, the legislative and the executive; and most awesome of all: its own. It is thus essential that the judiciary remain keenly aware of how important it is to properly circumscribe and keep scrupulously within the limitations of its own prerogatives. It is because of the delicacy of this latter responsibility of judging wherein its own self-interest is involved that, for the most part, the enlightened and responsible judiciary of our nation, state and federal, have always thought it to be a sacred obligation to be especially circumspect and restrained as to any extension of their own powers.[7] But it is our impression that in recent years this important concept has been more and more disregarded and lost sight of, especially by the federal courts.

It is our opinion that such a strained overreaching: into the legislative function; into matters which should be the exclusive prerogative of the states; and which is completely unfounded in principles of justice, can only be the result of an arrogance born of being so accustomed to unrestrained power as to become oblivious to traditional and essential standards of judicial restraint. It brings to us echoes of expressions of the past complaining against the

> "abuses and usurpations" of a despotic power, "pursuing invariably the same object, * * * the establishment of an absolute tyranny over these states" which would

> "subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his [their] assent to acts of pretended legislation:"

---

7. See statement re judicial restraint in Stickle v. Union Pacific R. Co., 122 Utah 477, 251 P.2d 867; see also the statements of Justice Frankfurter and Harlan in dissenting opinions in Baker, et al., v. Carr, et al., 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

"suspending our own legislatures, and declaring themselves invested with power to legislate for us in all cases whatsoever" who is

"deaf to the voice of justice"

"a prince [despotic power] whose character is thus marked by every act which may define a tyrant, is unfit to be the ruler of a free people." [8]

We thus express our disagreement with this Phoenix decision because of our conviction that it is so egregiously ill-advised and in error, and also because of what we believe to be the danger of the trend it represents in destroying the balance of power between the respective branches of government, and between the sovereignty of the states and the federal government, which have been so essential to the stability and success our system of government has thus far enjoyed. (All emphasis added.)

CALLISTER, J., concurs.

ELLETT, Justice (concurring).

I concur. However, I wish to make it clear that by doing so I am not changing the views expressed in my opinion in the case of Dyett v. Turner, 20 Utah 2d 403, 439 P.2d 266.

TUCKETT, Justice (concurring).

I concur. However, I do not join the majority wherein the opinion states we are in emphatic disagreement with the decision of the United States Supreme Court in the case of City of Phoenix v. Kolodziejski.

HENRIOD, Justice (concurring and dissenting).

I do not disagree with the main opinion's statement that the bond issue authorized by Washington County is valid, since it was not attacked within the statutory period,— as is pointed out in paragraph three thereof, and I agree that this particular bond issue is not controlled by the decision of the Kolodziejski case.

However, I dissent from the decision in the instant case for other reasons, principally because it is premature. There is nothing before us except the validity of the Washington County bond issue, and the opinion here should say so, and then stop. To "proceed upon the assumption that upon the issue mentioned [general obligation bonds], *it* [City of Phoenix v. Kolodziejski] *is controlling in this case*" is not at all proper or germane to the only matter we have before us. It simply is an announcement that we will decide a future case not yet filed in this court, on a legal principle that is in no way pertinent to our only issue on appeal, i. e., the validity of some bonds that

---

8. The quoted phrases are all from the Declaration of Independence.

were approved and became invulnerable to attack almost a year before what I think was an untenable, illogical and unsound conclusion in Kolodziejski. For this court now to adopt and quote that case as the law in this case, as the majority does, when that case by its own terms and by the statements of the main opinion is shown to be not pertinent, simply is to indulge prematurely in a bit of anticipatory stare decisis,—which this court has no authority or justification in doing.

I believe we are somewhat chumpy in deciding an issue not properly before us, by indulging in a sort of popularity contest in order to satisfy "the expressed desires of the parties,"—as is so aptly put by the main opinion. In doing so we neglect the "desires" of the man who owns his home, jeopardized by a bond issue. Not only have we neglected that man but so have the principals in this one-sided lawsuit, which has all the earmarks of being a tailor-made suit, with no resemblance to a true adversary proceeding. Had a real property taxpayer had a friend in this lawsuit, the latter would have pleaded in the answer the provisions of Title 11–14–12(5), Utah Code Annotated 1953, as a defense to this action,—which unpleaded statute is the very basis upon which the majority opinion judiciously spotted and correctly cites in approving the Washington bonds. Had such a defense been pleaded, the complaint would have been the victim of a sudden demise

and interment long before the birth of the Kolodziejski infant.

The main opinion pretty much concedes that we are dealing with something that is not really before us when it decides *this* case upon the authority of Kolodziejski, as well as on the limitations statute. Its footnote 3 has to do with sanctions as to strictly "moot" cases. The opinion cites no Utah authority for the procedure or propriety it approves. In proceeding as we have in this case by deciding a future case not before us, we introduce a new principle into Utah's jurisprudence,—that if a couple of litigants express a desire to have a problem of importance to the public decided by this court, they need but bring a suit for an injunction against someone, or anyone, which injunction surely will fail. He can then ask, as was done here, that we decide some other matter having no pertinency, and which hasn't happened, but might, although, as was the case here, no other remedies at law are not shown to be unavailable, no offer to indemnify against a wrongful injunction is offered, and no jurisdiction for timeliness of appeal is alleged or shown. That is this kind of a case, and the decision here is just what it says, "to satisfy the desires of the parties," and any suggestions anent expedition and desired results of an early decision. One thing can be said about our decision. It satisfies the desires of litigants and their counsel on both sides, the Washington County Commissioners whose

bonds are valid, the issuing bond brokers and their counsel, the voters who can vote with the knowledge that not they, but only the real property voters, may have to pay the piper, as it also satisfies those who are hell bent on socializing this country on its way to bankruptcy, and those of the judiciary who approve of Kolodziejski, with full ken that their robes and Cadillacs will suffer no whit when the sheriff executes the mortgage on the widow's mite,—the farm. This, then, leaves only an alternative for the mortgagor, unrepresented in this case, to try and sell his home lest Kolodziejski burgle it.

Under the Kolodziejski case a person with a $20,000 Rolls Royce, but no real property, could vote for an ill-conceived swimming pool bond issue upon which he would have no liability, while his next-door neighbor, owning a $20,000 home, might lose it if he either does not pay taxes to retire the bonds, or if for any reason the bonds are defaulted. It is inconceivable to me that the majority of the Supreme Court would fail to recognize the gross discrimination created by its decision.

Finally, this court should decide this case under the provisions of the Tenth Amendment. The United States Supreme Court in the above case did not once mention the Tenth Amendment, which in my opinion takes precedence over the questionable legitimacy of the Fourteenth Amendment, as adverted to in the Lonesome George concurrence of Mr. Justice Ellett. The fallacy of the Kolodziejski case is its implication that because the court questionably had corrected a voting right discrimination by its "one-man one-vote" case, that that result is justification enough to sanction a gross discrimination against one class of property owners in favor of another class of property owners, as is the case here. I am no prophet, seer or revelator, but I think that one day the court is going to have to swallow Kolodziejski and eliminate the very discrimination it has now created or else doff its wig in tribute to inconsistency, illogic and suffocation in the socio-economic quicksand of unprecedented constitutional precedent. There is nothing in that case that says the Tenth Amendment does *not* apply in this case. I am in favor of deciding this case under principles clearly stated in the latter Amendment, and if this issue, undecided in the instant case, is open to question, the people should be told exactly how the highest court in the land feels about states' rights. Thus, at least we may gain an insight into what will be felt about the states' judicial systems, and could, perchance, guess as to the length of time it will take for us to expect state judicial rigor mortis to set in, resulting in a closed-shop federal judiciary, divorced from any amenability to the people who thought they had authorized not the one, but the two independent systems. (Emphasis added.)