STATE of Utah, Plaintiff and Respondent,

v.

Ricky Joe ARCHULETTA, Defendant and Appellant.

No. 14636.

Supreme Court of Utah.

March 7, 1978.

Lyle J. Barnes, Kaysville, for defendant and appellant.

Vernon B. Romney, Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., Salt Lake City, Milton J. Hess, Davis County Atty., Farmington, for plaintiff and respondent.

CROCKETT, Justice:

Ricky Joe Archuletta appeals his conviction by a jury of burglary.[1] His claims of error are: (1) that he was denied a speedy trial; (2) that evidence was improperly admitted as to (a), his confession and (b), of the fact that he had previously been in prison.

On February 8, 1976, the home of Johnny and Judy Delgado in Ogden was burglarized while they were away. When they returned and discovered the burglary they notified the police. Investigation showed that the entry had been by breaking a bedroom window; and that a television, stereo system with speakers, and a hunting rifle had been taken. Significantly, a hair brush, which was later identified as belonging to defendant, was found among the broken glass near the window.

Defendant is a cousin of Johnny Delgado. He had been in the Delgado home earlier on the day of the burglary, when Johnny showed the defendant his new rifle. Also while he was there, there was some discussion about the defendant having to pay a fine, and the proposition was discussed that the items above referred to and others might be pawned in order to raise the money to pay the defendant's fine, but no such plan was agreed upon.

Mr. Delgado told the police that he had reason to believe that the defendant Ricky Archuletta and one Ralph Gomez may have committed the burglary. In their investigation the police contacted the defendant. He was given the *Miranda* warning. Some contention is made that he could not read or write English and that he did not fully understand the import of this questioning session by the officers. However, he was offered an interpreter, which he refused, stating that he understood "good enough." From the questions asked, and his responses, the trial court was satisfied that he did understand and participate in the conversation. Sparing the detail thereof, in his answers he told about himself and Ralph Gomez breaking into the Delgado home and stealing the television, stereo system, and the rifle. He also acknowledged that he had no permission to take them and offered to assist the police in recovering some of the items, which he later did. The essential questions and answers were reduced to writing and read to the defendant, and upon request of the police he signed the statement.

Concerning defendant's contention that he was not given a speedy trial, the essential facts are these: Defendant was arraigned on March 30, 1976, and a trial date was set for April 30, 1976. It was later discovered that April 30, was a legal holiday (Arbor Day) and thus the trial date was stricken from the calendar. Defendant filed a demand for a speedy trial on May 3, 1976. The court attempted to arrange a trial date for June 3rd, but it appears that the defendant's then counsel was unavailable for that setting; and the trial was set and carried out six days later, on June 9, 1976.

There is no doubt about the importance of complying with the requirements of both the United States and Utah Constitutions:[2] that one accused of crime is entitled to a prompt trial setting and disposition of the charge if he so desires and requests.[3] The purpose of those constitutional provisions is to guard against any intentional delay which may be oppressive or persecutorial in nature.[4] In order to avoid any such baneful effect the requirements of the law should be respected and complied with insofar as can be achieved within the practical operations of the courts. However, the court does not lose jurisdiction because of such a delay and, unless there is some intentional

1. Section 76–6–202, U.C.A.1953.

2. U.S.Const., Sixth Amend.; Utah Const., Art. I, Sec. 12.

3. Section 77–1–8, U.C.A. (1953) provides in criminal prosecutions, the defendant is entitled to have a speedy public trial and every defend-ant in a criminal action unable to get bail shall be entitled to a trial within thirty days after arraignment.

4. *U. S. v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

delay of an oppressive character, which results in prejudice to the defendant, the processes of justice should not be wholly defeated thereby. It is for this reason that this court has consistently held that the statutory time within which a trial shall be had is directory and not mandatory.[5] As the facts recited above show, there was no such abuse in this case.

■ Defendant's argument that evidence of his confession and/or admissions concerning the crime was improperly admitted is based mainly on his assertion that he could not read or write the English language and therefore did not understand the conversation with the police officers. Whether he could read or write the English language is immaterial and would not render his confession invalid.[6] That question was primarily for the trial court to determine and the evidence clearly supports its ruling that the defendant so understood and that his confession was voluntary.

■ The reference to the fact that the defendant had been in prison came from a voluntary statement in his mother's testimony; and in fact there had been a previous similar reference during the trial. In addition to those facts, there was neither objection nor motion to strike when the statement was made. For these reasons there was no impropriety in the occurrence of which the defendant can now complain.[7]

Other errors urged are without merit. For the reasons stated herein, the conviction is affirmed. No costs awarded.

MAUGHAN, WILKINS and HALL, JJ., concur.

ELLETT, Chief Justice (concurring with reservation):

I concur with the main opinion except for the statement that we must comply with the Sixth Amendment to the United States Constitution. That amendment as well as the other amendments, I through VIII, were and are applicable solely to the federal entity.

When the Constitution was proposed to the thirteen sovereign states, it appeared certain that it would not be ratified by the required nine of those states unless amendments were made so as to insure the sovereignty of the states against encroachments of the new federal power. Promises by the leading men were made to submit twelve amendments for approval as soon as the Constitution was ratified; and because those promises, the reluctant states ratified the original document and the United States of America became a nation on the first Wednesday in March, 1789.

Pursuant to the promises made, on September 25, 1789, the first congress did submit twelve proposed amendments to the Constitution for ratification by the sovereign states. Ten of those proposed amendments were approved and they became known as the Bill of Rights. Those amendments were the bulwark of the rights of the states to decide for themselves what laws should be effective in all state matters. The Ninth and Tenth Amendments make this abundantly clear. They read as follows:

IX. The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

X. The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

For over 140 years more than seventy justices of the Supreme Court consistently held that the first ten amendments to the Constitution applied as a limitation to the Federal Government only, and not in any manner to the states; and for seventy years

5. *State v. Lozano*, 23 Utah 2d 312, 462 P.2d 710 (1969); *State v. Rasmussen*, 18 Utah 2d 201, 418 P.2d 134 (1966).

6. *Birkenfeld v. State*, 104 Md. 253, 65 A. 1 (1906).

7. *Stagmeyer v. Leatham Brothers, Inc.*, 20 Utah 2d 421, 439 P.2d 279 (1968).

following the so-called adoption of the Fourteenth Amendment some thirty-five justices from every corner of the nation have held that the Fourteenth Amendment did not make the first ten amendments applicable to the states. Some of those justices had helped to frame the original Constitution and the first ten amendments and had worked to secure the adoption thereof. Others had participated in the war between the states and were acquainted at firsthand with the purposes intended to be accomplished by the Fourteenth Amendment. All of them interpreted the Constitution, including the amendments, with knowledge and wisdom born of intimacy with the problems which had called forth the documents in the first place.

The United States Supreme Court, as at present constituted, has departed from the Constitution as it has been interpreted from its inception and has followed the urgings of social reformers in foisting upon this nation laws which even Congress could not constitutionally pass. It has amended the Constitution in a manner unknown to the document itself. While it takes three-fourths of the states of the Union to change the Constitution legally, yet as few as five men who have never been elected to office can by judicial fiat accomplish a change just as radical as could three-fourths of the states of this nation. As a result of the recent holdings of that Court, the sovereignty of the states is practically abolished, and the erstwhile free and independent states are now in effect and purpose merely closely supervised units in the federal system.

I do not believe that justices of once free and independent states should surrender their constitutional powers without being heard from. We would betray the trust of our people if we sat supinely by and permitted the great bulk of our powers to be taken over by the federal courts without at least stating reasons why it should not be so. By attempting to save the dual relationship which has heretofore existed between state and federal authority and which is clearly set out in the Constitution, we think we act in the best interest of our country.

I feel like a galley slave chained to his oars by a power from which I cannot free myself; but like slaves of old, I think I must cry out when I can see the boat heading into the maelstrom directly ahead of us; and by doing so, I hope the master of the craft will heed the call and avert the dangers that confront us all.[1]

The news media recently quoted the Chief Justice of the U.S. Supreme Court as saying that one-half of the lawyers in the country are incompetent. If the statement is true, then surely it applies to judges as well, for few, if any, judges have ever manifested any particular proficiencies as competent lawyers prior to their appointments to the bench.

Some thirty-five or forty years ago, men were appointed to the Supreme Court of the United States who began to arrogate unto themselves all power whether it applied to federal problems or to state problems. The state courts, out of respect for the high office or out of a failure to defend their own constitutional powers, have supinely sat by and permitted the assumption by the Supreme Court of the right to decide purely state matters. As a result, that Court now decides where children will attend school, what qualifications the state must have for voters, what restrictions can be placed on applicants for a license to marry, what penalties can be imposed for crime, how the state legislatures can legislate regarding the defining of legislative districts, and numerous other matters of purely state concern.

The claim of the right of the U.S. Supreme Court to interfere in matters outside of its competence is based upon the assertion that the Fourteenth Amendment to the Constitution confers those powers upon it. The particular language upon which the Court relies is this:

. . . [n]or shall any State deprive any person of life, liberty, or property, without due process of law; . . . .

1. See my opinion in *Dyett v. Turner*, 20 Utah 2d 403, 439 P.2d 266 (1968).

If it can be assumed that the Fourteenth Amendment was validly approved,[2] then the quoted words merely inhibit the states from doing the identical matters that the Fifth Amendment prohibits to the federal entity. That amendment states:

. . . nor shall any person . . be deprived of life, liberty, or property, without due process of law; . . ..

The term "due process of law" has a clear meaning. It is defined in Bouvier's Law Dictionary as follows: "Law in its regular course of administration through courts of justice."

In *Springer v. United States*[3] the Supreme Court of the United States said:

'Due process of law,' in its true and largest signification, means law in its regular course of administration by the courts of justice, and not the execution of a power vested in ministerial officers.

Also in the case of *Minder v. Georgia*[4] the U.S. Supreme Court said:

The requirements of the Fourteenth Amendment are satisfied if trial is had according to the settled course of judicial procedure obtaining in the particular state, and the laws operate on all persons alike and do not subject the individual to the arbitrary exercise of the powers of government. . . .

The term "due process of law" is further defined in 16 Am.Jur.2d, Const.Law, Sec. 546, as follows:

. . . It has been said that due process of law must be understood to mean law in the regular course of administration through courts of justice according to those rules and forms which have been established for the protection of private rights. . . . A general law administered in its legal course according to the form of procedure suitable and proper to the nature of the case, conformable to the fundamental rules of right and affecting all persons alike, is due process of law.

The Supreme Court of the United States holds that the failure to give a criminal defendant a speedy trial or a competent lawyer, or to allow a policeman to make inquiry of a guilty thief or murderer is a denial of due process. In fact, it now holds that the first eight amendments are made applicable to the states by reason of the due process clause of the Fourteenth Amendment.

If *due process* meant what the Great Court now says it means, then why was it necessary to include the specific limitations on federal powers as contained in the first eight amendments? Why did not those amendments simply say, 'No person shall be . . . deprived of life, liberty, or property, without due process of law,' and leave it to the courts to prevent searches without warrants; to prevent an officer from questioning a suspected felon; to compel speedy trials; to require counsel for all persons accused of crime; etc.?

The reason is obvious. *Due process* does not mean at all what the Great Court now says it means.[5] . . .

I cannot, in good conscience ever agree that the so-called Bill of Rights is a limitation on the powers of the individual states. Each state has its own version of a Bill of Rights. The essential difference is this: Shall the state courts be the final arbiters of their own laws under their own Constitutions; or shall the federal courts through their spurious assumptions of power "ride herd" upon the decisions of each and every state court in the Union?

By assuming the ultimate power to control the nation, the Supreme Court has greatly multiplied the work of the federal courts and to an even greater extent increases the work load of the state courts. In addition, it has caused needless delay in the trial of criminal cases.

2. That it cannot be so assumed, see *Dyett v. Turner*, Id.

3. 102 U.S. 586, 591, 26 L.Ed. 253 (1880).

4. 183 U.S. 559, 22 S.Ct. 224, 46 L.Ed. 328 (1902).

5. *State v. Richards*, 26 Utah 2d 318, 323, 489 P.2d 422, 425 (1971).

If the Supreme Court of the United States would abide by the clear meaning of the Constitution, as each member of that Court promised to do under his oath, then the services of one-half of the federal judges could be dispensed with and the loud cry for more judges would be silenced. The states could dispose of criminal cases with finality without the years of delay that now causes so much criticism of the judicial system of this nation. May the time speedily come when only *competent lawyers* will serve on all courts, both state and federal.