512 P.2d 1031

The STATE of Utah, Plaintiff and Respondent,

v.

Samuel JAMES, Jr., Defendant and Appellant.

No. 13155.

Supreme Court of Utah.

July 19, 1973.

light of the decision of the United States Supreme Court outlawing the death penalty, the proceeding was no longer a capital case, and defendant was only entitled to an eight-man jury. Defendant appeals therefrom, contending that he was denied a twelve-man jury as guaranteed to him by Article I, Sec. 10, Constitution of Utah.

The specific issue of this case is what is the effect of Furman v. Georgia [1] on the procedural guarantees granted by statute and the Constitution to defendant in a capital case?

Article I, Section 10, Constitution of Utah, provides:

> In capital cases the right of trial by jury shall remain inviolate. In courts of general jurisdiction, except in capital cases, a jury shall consist of eight jurors . . .

Section 78-46-5, U.C.A.1953, provides:

> A trial jury in capital cases shall consist of twelve jurors. A trial jury in other criminal cases . . . in the district court shall consist of eight jurors . . .

The precise holding as expressed in the per curiam opinion in Furman v. Georgia [2] was that the imposition and carrying out of the death penalty in the cases before the court constituted cruel and unusual punishment in violation of the Eighth and Four-

Phil L. Hansen, Salt Lake City, for defendant-appellant.

Vernon B. Romney, Atty. Gen., David S. Young, Asst. Atty. Gen., Joseph P. McCarthy, Asst. Atty. Gen., Salt Lake City, for plaintiff-respondent.

CALLISTER, Chief Justice:

Defendant was convicted by a jury of the crime of murder in the first degree; he was sentenced to the Utah State Prison for the term provided by law.

In a hearing in chambers, immediately preceding the trial, the court ruled that in

1. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972).

2. Note 1, supra.

teenth Amendments. Each justice issued a separate opinion, expressing his individual interpretation of the constitutional issues.

Subsequent to the *Furman* decision, there have been a number of opinions regarding its effect on constitutional and statutory provisions concerning bail in "capital cases" or "capital offenses." However, there are only two jurisdictions which have been reported so far that have determined the effect of *Furman* concerning specific procedures reserved exclusively for the conduct of a trial in a capital case.

In Donaldson v. Sack,[3] the court reasoned that the death penalty must be a possible punishment in all "capital cases." Since the death penalty had been eliminated by the ruling of the United States Supreme Court, the rules were no longer applicable, which required twelve persons to constitute a jury to try all capital cases. The court concluded that Florida no longer had what had been previously termed a "capital case."

The court reached the opposite conclusion in State v. Holmes,[4] wherein the court assessed the effect of *Furman* on a provision in the State Constitution that in cases in which the punishment may be capital, all of the jury of twelve must concur to render a verdict. The State urged that there were no more capital cases, since the only punishment available for the crime of murder was life imprisonment; therefore, the provisions concerning juries in non-capital cases were now applicable to those formerly designated "capital cases."

The court responded that the severity of the offense was legislatively determined and depended upon the maximum penalty which could be imposed for the offense charged. The court explained that for three-fourths of a century, the legislature had made provisions for procedural matters in criminal cases which depended on the classification in the Louisiana Constitution. The court observed that if the legislature had eliminated capital punishment but remained silent with respect to procedural changes, the court might be justified in adopting the reasoning of the State— that all statutory references to capital cases should be ignored. The court continued:

> However, it was not the legislature, but the United States Supreme Court that has held the *imposition* and *execution* of the death sentence, *as now applicable* in our State, to be violative of the United States Constitution. No presumption arises that any other provision of Louisiana law has been affected by the United States Supreme Court, except those having to do with the *imposition* and *execution* of death sentences. Nor,

3. Fla., 265 So.2d 499, 503 (1972).

4. 263 La. 685, 269 So.2d 207, 209 (1972).

indeed, has the United States Supreme Court eliminated the possibility that the Louisiana legislature might enact statutes which could constitutionally impose the death sentence, when the sentence is mandatory and cannot be applied in a discriminatory manner.

Although the hiatus is obvious and the situation undesirable, we conclude that we should (at least until the legislative process has reorganized the criminal law and procedure in view of Furman) interpret Article 7, Section 41 of the Louisiana Constitution as referring to classes of crimes, and that those which the legislature has classified as capital offenses shall be tried by a jury of twelve, all of whom must concur to render a verdict.

The cases, which have considered the impact of Furman, when the right to bail is contingent on whether the defendant is charged with a capital offense, indicate a split of authority. One group proceeds on the "penalty" theory, and the other follows the classification theory. The "penalty" theory is illustrated by Commonwealth v. Truesdale;[5] wherein the court stated that a "capital offense" refers to the punishment or penalty which may be imposed upon the person found guilty of a crime, rather than a definition of a particular crime. The court reasoned that since, presently, there were no criminal offenses in the Commonwealth, for which the death penalty might be imposed, there were no "capital offenses."[6]

The "classification" theory is illustrated in People v. Anderson[7] wherein the court explained that the constitution and statutes refer to a category of offenses for which the punishment of death *might* be imposed. The law determined the gravity of such offenses; those offenses remain the same, although punishment by death cannot constitutionally be exacted. Nevertheless, the gravity of those offenses endures.[8]

The "classification" theory appears preferable, particularly in light of the additional safeguards provided in the Constitution of Utah to a defendant, charged with a crime so distinct and grave in nature that the legislature has deemed death an appropriate penalty. There are three crimes designated in this unique category: murder in the first degree (§ 76–30–4, U.C.A.1953), kidnaping in the first degree (§ 76–35–1, U.C.A.1953), and a particular type of assault by a convict (§ 76–7–12, U.

5. 449 Pa. 325, 296 A.2d 829, 832 (1972).

6. Also see State v. Johnson, 61 N.J. 351, 294 A.2d 245 (1972); Ex Parte Contella, Tex.Cr.App., 485 S.W.2d 910 (1972).

7. 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880, 900, Footnote 45.

8. Also see State v. Haga, 81 Wash.2d 704, 504 P.2d 787, 789 (1972); People ex rel. Dunbar v. District Court, Colo., 500 P.2d 358 (1972); State v. Flood, 263 La. 700, 269 So.2d 212 (1972).

C.A.1953, as amended 1957). The Constitution of the state has provided a system of classifying certain serious offenses as capital cases and then mandated a specific procedural structure for the administration of justice based on that classification. Furman v. Georgia cannot be rationally construed as abrogating our fundamental law.

■ "Capital cases" as this term is used in Article I, § 10, refers to a category of criminal actions, including therein the entire prosecution and not merely the last stage, the penalty phase. Furman v. Georgia is limited to this final phase of the action, the imposition and execution of the death penalty. Murder in the first degree has been classified as a capital crime by the legislature; *Furman* affected only the punishment; the *nature* of the crime remains unchanged.

■ Defendant was entitled to be tried by a twelve-man jury; the trial court committed prejudicial error when it denied him this right. Defendant's other points on appeal are without merit. This case is reversed and remanded to the district court for a new trial.

CROCKETT, and TUCKETT, JJ., concur.

HENRIOD, J., concurs in the result.

ELLETT, Justice (concurring in the result).

I concur in reversing this case because the appellant could not be tried by an eight-man jury. His crime was that of murder in the first degree, and the only penalty provided by law for conviction thereof without recommendation of leniency by the jury and a concurrence therein by the trial judge is death.[1]

To remove the penalty provided by law is to cast doubt upon the statute as it relates to murder in the first degree. The law is set out in 21 Am.Jur.2d, Criminal Law, § 16, as follows:

> . . . [A] criminal statute is of no force or effect if no penalty whatever is provided for its violation . . .

The prevailing opinion gives more credit to the case of Furman v. Georgia than it deserves. That case has ten opinions on *it*, although there are only nine justices. The only thing agreed upon by a majority of the court was that the death penalty was *cruel and unusual*. The reasons given by the concurring justices are devoid of reason, logic or common sense. Let us look at those reasons:

*Justice Douglas* says that to apply the penalty selectively to minorities suggests *cruel and unusual*. He cites McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711, wherein the court not only

1. Sec. 76–30–4, U.C.A.1953.

*refused* to hold the death penalty unconstitutional but also held that the determination by the jury of whether the penalty should be imposed was not prohibited by the federal constitution. He quotes from the President's Commission on Law Enforcement and from Bedau's Anthology of the effect that the death penalty has been disproportionately imposed on the poor, the Negro, and the unpopular groups of our society. He further quotes the warden of Sing Sing Prison to the effect that an "assigned lawyer" usually has had no experience whatever in capital cases.

The accuracy of the quotes was not proved and surely could not be applied to all of the states of the Union. In Utah there has been only one Negro executed since statehood back in 1896.

One would think that a judge, even of the Supreme Court, would know more about lawyers and their abilities than would the warden of Sing Sing Prison. Why quote the warden? Does his Honor mean to say that the lawyer for Furman was incompetent and without any experience whatever in capital cases? If he thought so, then why did he not vote to give a new trial? What has the experience (or lack thereof) on the part of a lawyer got to do with the legality of the penalty as fixed by law for a crime?

If his Honor could have advanced a better reason for his decision, he undoubtedly would have advanced it.

*Justice Brennan* quotes from Patrick Henry as follows:

. . . Congress, from their general powers, may fully go into the business of human legislation. They may legislate, in criminal cases, from treason to the lowest offense—petty larceny . . .

Although he quotes the language, he seems unwilling to abide by the acts passed by the legislative branches of government in a case where the age-old death penalty is involved. This attitude seems to be born of a determination to remake the social order rather than a desire to follow the law as it has been written and followed by his predecessors ever since the beginning of the nation. He repeatedly cites the case of Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878), regarding constitutional limitations on the power of territorial legislatures to impose the death penalty, knowing full well that the court on which he now sits then affirmed the sentence of death which had been imposed on Wilkerson— and that under a law substantially as it is today, to wit:

Every person guilty of murder in the first degree shall suffer death, or, upon recommendation of the jury, may be imprisoned at hard labor in the penitentiary for life, at the discretion of the court.

In affirming the sentence imposed upon Wilkerson, the High Court said:

Cruel and unusual punishments are forbidden by the Constitution, but the

authorities referred to are quite sufficient to show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in that category within the meaning of the eighth amendment.

The best that can be said for the opinion is that the justice makes a good argument against inflicting the death penalty by torture—a proposition that was never claimed in the Furman case. His Honor also says:

> We know "that the words of the [Clause] are not precise, and that their scope is not static." We know, therefore, that the Clause "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." . . .

> \* \* \* \* \* \*

> At bottom, then the Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments. . . .

> \* \* \* \* \* \*

> A third principle inherent in the Clause is that a severe punishment must not be unacceptable to contemporary society . . . .

His opinion would seem to leave it to the court rather than to the legislative branch of government to decide whether a contemporary society considers the death penalty unacceptable. One gets the idea that the opinion would elevate the judges to the high position of enacting laws prescribing penalties for crimes.

The legislators, who, by the way, are *elected* to office by that contemporary society, are in a much better position to assess the feeling of society than is a justice of the Supreme Court, who gets his appointment to office for life without so much as having to face that maturing society in even one election.

The decision also seems to hold that a punishment prescribed by law must comport with what the *justice thinks* is human dignity, or else it is cruel and unusual. Where did he get that idea? Certainly not from the plain words of the constitution; certainly not from the Bible, where capital punishment was the established law from time immemorial. In fact, the Good Book shows that death was the punishment prescribed for 36 crimes: beheading for two crimes; strangling for six crimes; burning for ten crimes[2] and stoning for 18. In addition, the death penalty could be imposed for false swearing if given in a capital case.

In order to hold the death penalty unconstitutional, it must be both *cruel and*

2. Burning was not performed as customary with the American Indians. Death was effected by strangulation, and then a light-ed wick was thrown into the mouth as the jaw dropped in death.

*unusual.* The human dignity element and the maturing society are simply red herrings placed in the opinion by way of a diversion so that a reader might not stop to see if the opinion was really discussing the so-called Per Curiam opinion, which only said the death penalty was both *cruel and unusual.*

The decision cites the case of Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), wherein it was held that denaturalization of a naturalized citizen as a punishment for desertion from the military services in time of war was not permissible under the Eighth Amendment.

The case has no relevancy to the question as to whether the death penalty is unusual. Denaturalization was a novel punishment and, therefore, was unusual.[3] The justice admits that the death penalty has been imposed and executed since civilization began. Besides, in the Trop case four of the justices dissented.

If his Honor had only followed the clear language of footnote 32 in the case he cited, he could not have held that the death penalty was cruel and *unusual.*

The opinion gets off on a tangent by saying that the state may not impose an unusually severe punishment. This gets his Honor off of the hook so far as *cruel* is concerned, but leaves him impaled on the *unusual* part of the amendment.

The decision then goes into some statistics for the United States—not relevant to the matter before the court. His Honor shows that fewer death penalties have been imposed since 1964 than were imposed prior thereto. He probably intends to imply that this results from a maturing society. He does not tell us, however, that it is his own court which has officiously interfered in state matters by issuing stay orders which prevented the lawful sentences from being carried out.

Even if death penalties are becoming rare, it only shows either that juries do not convict, that fewer crimes are committed, or that legislatures are changing the penalties. Certainly it does not justify the Supreme Court in holding that the customary penalty for murder in the first degree is *unusual.*

The opinion says that "An examination of the history . . . of punishing criminals by death reveals that this punishment has been almost totally rejected by contemporary society."

His Honor must have misread his history, or the book was in error. One only

---

3. In footnote 32 of the Trop case it is said : "If the word 'unusual' is to have any meaning a part from the word 'cruel,' however, the meaning should be the ordinary one, signifying something different from that which is generally done."

has to look at the result of the recent election in California or to read the many polls reported in the news media to know that his statement is simply not true. Besides, it is the responsibility of the legislature to change penalties and not that of a contemporary society or of the Supreme Court.

*Justice Stewart* claims that the death penalty is unusual in the sense that the penalty of death is infrequently imposed. Does he mean to say that the penalty would be constitutional if all persons found guilty of a capital offense were executed? Is he implying that there is no difference in connection with the manner in which the crimes are committed or in the nature and character of the perpetrators of those crimes?

His decision seems to give him solace about holding the penalty *unusual* by saying that the death penalty is cruel and unusual in the same way that being struck by lightning is cruel and unusual. His statement indicates the strawgrabbing effort on his part to hold *unusual* that which has been the *usual* for thousands of years.

Finally, he departs from the basis of the Per Curiam opinion and holds capital punishment to be violative of the Constitution of the United States—not because it is cruel and unusual as the Per Curiam holds but because it is "freakishly imposed."

*Justice White* sees clearly that the death penalty is not unconstitutional per se. He says:

> It is perhaps true . . . the penalty so imposed is not disproportionate to the crime and those executed may deserve exactly what they receive.

However, he fears that the need of society for specific deterrence does not justify death for so few when so many in like circumstances get prison terms. He further says:

> . . . But the penalty has not been considered cruel and unusual punishment in the constitutional sense because it was thought justified by the social ends it was deemed to serve. At the moment that it ceases realistically to further these purposes, however, the emerging question is whether its imposition in such circumstances would violate the Eighth Amendment.

This argument would be worth listening to if it came from a legislator whose *duty* it is to prescribe penalties, but what does it have to do with deciding whether the death penalty is cruel *and* unusual?

It may be that the legislatures should change the penalty, but until they do so, it is not a function of the court to refuse to enforce the law simply because a majority of the justices may hold to a belief that

the prescribed punishment will not serve society.

*Justice Marshall* quotes from Granucci as follows:

. . . [T]hat the cruel and unusual punishments clause of the Bill of Rights of 1689 was first, an objection to the imposition of punishments which were unauthorized by statute and outside the jurisdiction of the sentencing courts, and second, a reiteration of the English policy against disproportionate penalties.

Had his Honor given more than lip service to the quoted language, he could hardly have voted as he did. The present death penalty is not one "unauthorized by statute," nor is it "outside the jurisdiction of the sentencing court." Besides, it has been almost three hundred years since 1689, and during all of that time capital punishment has been imposed.

His Honor refers to a number of cases where the punishment was unique [4] and quotes the holding in those cases as to whether the punishment is also cruel. The language of those cases gives no valid reason for holding as he did that *death* is an unusual punishment. In fact, his Honor admits that the death penalty is *not* unusual when he says that capital punishment has been used to penalize various forms of conduct of members of society since the beginning of civilization.

Despite his words clearly showing that he knows the death penalty is not unusual, he is able to swallow them and concur with a Per Curiam opinion which holds that the death penalty constitutes cruel and *unusual* punishment.

One of the reasons he gives for holding capital punishment to be cruel and unusual is this: "It is my firm opinion that the death penalty is a more severe sanction than life imprisonment."

It is difficult to see what his opinion on that clear matter has to do with the question which he answers by also saying, in effect: Therefore, the death penalty is both cruel and unusual.

How long can a "maturing society" respect a court that refused to impose a lawful sentence simply because the judge may feel that some penalty not provided for by law might be less severe?

The opinion disparages opinion polls (and it would seem election results as well) and then says:

. . . This is because whether or not a punishment is cruel and unusual depends, not on whether its mere mention "shocks the conscience and sense of justice of the people," but on whether

---

4.  Denaturalization; execution of the death penalty by electrocution; 15 years' imprisonment with chains on the ankles of the prisoner, etc.

people who were fully informed as to the purposes of the penalty and its liabilities would find the penalty shocking, unjust, and unacceptable.

One gets the impression that he is saying that it is the five concurring justices who are fully informed in the matter and it is they—all five of them—who find the penalty shocking, unjust, and unacceptable.

The opinion goes on to state:

.  .  .  [E]ven if capital punishment is not excessive, it nonetheless violates the Eighth Amendment because it is morally unacceptable to the people of the United States at this time in their history.

It sounds like the justice not only is advocating civil disobedience, but that by his ruling he is actually practicing it.

His Honor also asserts as a fact that it costs more to execute a prisoner than to imprison him for life. He does not tell us that the extra expense is due to the intermeddling by his court which prevents the penalty from being properly and timely executed. The statement as made indicates a complete lack of knowledge of the facts of the situation. The figures are more likely to be $500 to execute a prisoner as against $5,000 per year to imprison him.

His Honor makes an argument about the claim that capital punishment is no deterrent to crime. If he really wants to recti-

fy what he considers to be an unwise statute, would it not be better for him to retire from the high position of interpreting the meaning of laws and try to get himself elected to that branch of government which, under the constitution, has the responsibility of determining what the penalty should be?

It is interesting to speculate upon how many votes he could get from people fully informed if he announced his platform as that indicated by his opinion.

The opinion speaks of discrimination and makes complaint because a greater proportion of Negroes have been executed for certain crimes than have White men. There is nothing said about which race is committing the most crimes. It would seem that the penalty should not be imposed in a proportionate manner unless the number of crimes committed was also proportionate.

The opinion also laments the fact that more men have been executed than women.

It seems that his Honor might have held capital punishment to be constitutional if the states had imposed the death penalty proportionately; that is, for every guilty male Negro executed, one female Negro, ten White men, and eleven White women must also be executed.

It is difficult to see how the concurring justices can say that the Eighth Amendment proscribes capital punishment in the

light of the language of the Fifth Amendment, which reads:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, . . .

There are other reasons why I cannot believe that Furman v. Georgia has any validity. In the first place, how does Furman get into the Supreme Court? The sovereign state of Georgia is a party to the matter. Did Furman appeal from the ruling of the Supreme Court of Georgia? It seems he did, for the Per Curiam opinion states that judgment is reversed. It appears that he went up on a writ of certiorari, which permits the High Court to hear or refuse to hear the matter. Certiorari is an appellate proceeding for re-examination of action of an inferior tribunal. Orginally and in English practice it was a writ commanding judges of inferior courts to certify or to return records or proceedings in a cause for judicial review of their action.[5]

If Furman had appealed the case, then the Supreme Court had no jurisdiction, for when a state is a party, the Supreme Court only has original jurisdiction, not appellate jurisdiction.[6]

If Furman had brought an original suit against the State of Georgia, then the court would have had no jurisdiction to entertain it by reason of the Eleventh Amendment as amplified by the case of Hans v. Louisiana.[7]

As to the invalidity of the Fourteenth Amendment, see my lonesome opinion in the case of Dyett v. Turner, 20 Utah 2d 403, 439 P.2d 266 (1968).

I therefore, think that capital punishment is lawful in Utah, and the death penalty for murder in the first degree, when no recommendation is made by the jury, is the only penalty we have, and its imposition is mandatory.[8] It appears that the penalty may not be executed due to the erroneous holding of the Supreme Court in Furman, but our courts can impose no other penalty than that prescribed by our law. Therefore, the defendant charged with a capital offense is entitled to have a jury of 12 persons to hear and determine his case. When the Supreme Court makes a more rational decision and retreats from its untenable position assumed in the Furman case, the proper penalty can then be carried out. Until that time comes, we can

---

5. See cases under Certiorari in Black's Law Dictionary; also see 14 Am.Jur.2d, Certiorari § 13.

6. Article III, Sec. 2, U.S. Constitution.

7. 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1889).

8. State v. Markham, 100 Utah 226, 112 P.2d 496 (1941).

only sentence first-degree murderers to death and order the warden to hold them until the Supreme Court of the United States withdraws its interdiction.