2018 UT App 91

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
THAD DOUGLAS ROBERTSON,
Appellant.

Opinion
No. 20150859-CA
Filed May 17, 2018

Fifth District Court, Cedar City Department
The Honorable G. Michael Westfall
No. 131500082

B. Kent Morgan, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

MORTENSEN, Judge:

¶1     Seeking a reaction from his friend sitting nearby, Defendant Thad Douglas Robertson pulled out a concealed revolver and pointed it at his girlfriend's head. Then he pulled the trigger. The revolver fired. He later claimed that the gun, which he had owned for nearly three decades, "startled" him by going off. Defendant then turned the firearm on his friend and shot him. Twice. Both the girlfriend and the friend died. Appealing from his convictions for aggravated murder, Defendant claims that the trial court and his defense counsel made missteps relating to the jury voir dire process, that the evidence was insufficient to support his convictions, and that he was deprived of the effective assistance of counsel at trial. We reject his claims and affirm his convictions.

BACKGROUND

¶2     Defendant and his Girlfriend spent Valentine's Day at her house, where Defendant was living. The next morning, they awoke and smoked methamphetamine before Defendant left for a time. When he returned, Friend—whom Defendant had not seen in six months—was at the house. Friend asked, "Can I invite you in?," which "upset [Defendant] greatly" because, "[w]ell, wouldn't it upset you if a guy showed up and invited you into your own home?" So Defendant again left the house.

¶3     When he returned to the home the second time that day, Defendant could hear Girlfriend and Friend talking in the living room. He claimed that they got quiet as soon as he opened the door, which further irritated Defendant. His response was to go to his bedroom and retrieve his revolver, concealing it in the waistband of his pants.

¶4     Returning to the living room, Defendant, assuming "there was some sort of an affair going on," asked Friend how long it "had been going on." According to Defendant, Girlfriend then said, "Oh, no, [Friend]. He knows that we're sleeping together." But Defendant said Girlfriend was "probably just being sarcastic," as she "was very sarcastic." He nevertheless pulled the gun out and pointed it at Girlfriend's head, looking at Friend to see his reaction. Then Defendant pulled the trigger, shooting Girlfriend in the head.

¶5     Defendant later asserted that he believed the cylinder under the hammer in the revolver was empty, so he was "startled" when the gun went off.

¶6     After shooting Girlfriend, Defendant looked at Friend, who had "started to come up out of his seat." Defendant "turned the gun on him, fearing that [Friend] was going to come after [Defendant]" and shot him, causing Friend to stumble and fall. When Friend "started to try and get up again," Defendant shot

him a second time, reasoning again, "I thought [Friend] was going to come after me."

¶7 According to Defendant, he then went to Girlfriend and touched her head, covering his hand with blood. He originally thought she was dead, but upon moving closer, he noticed that she was still breathing. Defendant later claimed that he kissed Girlfriend on the forehead before asking, "[W]hat have I done?"

¶8 Defendant claimed he then called his daughter on the phone, telling her he was calling to say goodbye and to ask her to manage his finances because he was going to commit suicide. He explained that Girlfriend had been shot and mentioned that "somebody else possibly could have been shot." Defendant ended the call by saying that Girlfriend was making noise so he had to go. Daughter testified that throughout the phone call, Defendant was calm. Aside from the content of the conversation, it seemed "like a normal phone call."

¶9 Daughter called the police to report that her father was suicidal. Police responded to Girlfriend's house, where they saw Defendant pacing in front of the house, smoking a cigarette. He initially told police that when he entered the house, he found that two people had been shot. He claimed that he did not know the man who had been shot but explained that his girlfriend had been shot and had a handgun; he gave police the impression that Girlfriend was the shooter and was still armed.

¶10 The police wanted to provide aid to the injured parties but were faced with Defendant's claim that the shooter was still inside the house with a gun. They thus determined that it was a "high risk" situation and directed medical personnel to delay entering the home. A SWAT team was called in.

¶11 Meanwhile, police questioned Defendant, trying to better understand the situation inside the house. Defendant "was a bit hesitant" to provide information and was "elusive" in his

answers. When police asked Defendant why he had not called 911 when he first discovered Girlfriend's injuries, he claimed, "She raised up the gun and I thought she might shoot me, so I went back [into] the bedroom." He further claimed that Girlfriend was suicidal and had earlier taken a large quantity of pills.

¶12   Police went on to question Defendant about his conversation with Daughter, asking why he had told her that he had shot two people. He said he did not remember saying that to Daughter and, in fact, did not know why he would have said that.

¶13   The SWAT team, followed by medical personnel, eventually entered the house. They observed Girlfriend sitting with her head against the couch, holding her hands by her face, her eyes swollen shut. Her hands were "shaking uncontrollably" and she kept repeating, "Let me die. Leave me alone. Let me die alone." Defendant's revolver was in her lap. Girlfriend was transported to the hospital, where she died four days later. Friend was dead when medical personnel entered the house.

¶14   Subsequent police investigation uncovered that Defendant had not called Daughter immediately after shooting Girlfriend and Friend. Instead, he had left the scene, visited his mother's house, then called Daughter when he returned to Girlfriend's house. Defendant had left a handwritten note at his mother's house, giving his mother power of attorney and directing the distribution of his belongings to his children. Defendant eventually admitted to police that he wrote the note after shooting Girlfriend and Friend.

¶15   The State charged Defendant with, among other charges, aggravated murder for the deaths of Friend and Girlfriend. At trial, a firearms expert testified that it is easy to tell which cylinders in Defendant's revolver are loaded because the rim of the cartridge protrudes slightly out of and above the cylinder.

Defendant had owned the revolver used in the shootings for twenty-eight years.

¶16 The case was tried to an eight-member jury. Voir dire was conducted in two sessions: one in court and one in-chambers. While Defendant was present during the first round of voir dire, he elected not to be present during the latter part, which took place in-chambers. Before the in-chambers voir dire began, defense counsel noted on the record that Defendant agreed not to be present, and the trial court advised Defendant that he had a right to be present during jury selection. Defendant told the court that he trusted his attorney, and the court found that Defendant "knowingly and voluntarily waived his right to be present at voir dire."

¶17 The State did not seek the death penalty, having filed the charges as noncapital first degree felonies. The jury convicted Defendant as charged, finding him guilty of two counts of aggravated murder, one count of possession of a controlled substance in a drug-free zone, one count of possession of a firearm by a restricted person, and one count of possession of drug paraphernalia in a drug-free zone. The trial court sentenced Defendant to two consecutive sentences of life without parole for the aggravated murders and concurrent prison terms for the other crimes. Defendant now appeals his convictions for aggravated murder, seeking a new trial on those charges.

ISSUES AND STANDARDS OF REVIEW

¶18 We are asked to decide several issues on appeal. First, Defendant argues that the trial court plainly erred by allowing him to be tried by an eight-person jury. He further argues that the aggravated murder statutory scheme is unconstitutional. Next, Defendant argues that the trial court plainly erred by failing to ensure that his waiver of his right to be present at voir dire was knowing and voluntary. Defendant also challenges the

sufficiency of the evidence supporting his convictions for aggravated murder. Finally, Defendant argues that his trial counsel was constitutionally ineffective.

¶19   Where Defendant's arguments rest on a claim of plain error, we require that he demonstrate: "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

¶20   "The constitutionality of a statute is a question of law that we review for correctness." *State v. Angilau*, 2011 UT 3, ¶ 7, 245 P.3d 745 (cleaned up). "In evaluating sufficiency of the evidence claims, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict." *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 6, 358 P.3d 1067 (cleaned up).

¶21   "To succeed on a claim of ineffective assistance of counsel, [Defendant] must establish that trial counsel performed deficiently and that counsel's deficient performance resulted in prejudice." *State v. Heywood*, 2015 UT App 191, ¶ 16, 357 P.3d 565. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).

ANALYSIS

¶22   Defendant's specific contentions can be more broadly categorized as issues with jury selection, sufficiency of the

evidence, and defense counsel's performance. We address his contentions under that framework.

## I. Jury Selection

### A. Number of Jurors

¶23 Defendant presents us with a convoluted analysis that, in his view, demonstrates that the "trial court committed plain error in not ensuring that [he] be tried by a twelve-person jury." He begins with a proposition no one will dispute—that criminal defendants have the constitutional right to a public trial by an impartial jury. *See* U.S. Const. amend. VI. And under the Utah Constitution, "the jury shall consist of twelve persons" in "capital cases." Utah Const. art. I, § 10. He then recounts a brief history of the death penalty in the United States and in Utah, including our supreme court's decision in *State v. James*, 512 P.2d 1031 (Utah 1973), and a related discussion of the penalty theory and the classification theory of capital crimes.[1] *See id.* at 1032–33. Although the *James* court concluded that "[t]he 'classification' theory appears preferable," *id.* at 1033, Defendant goes on to suggest that his "case is unique in several respects and deserves an analysis of both theories to determine what a 'capital' case truly is under current Utah state law." Defendant then sets forth that analysis and ultimately concludes, "A case where life without parole is a potential punishment *must* be treated in all respects as a capital case."

---

1. The penalty theory refers to a capital offense as a "punishment or penalty which may be imposed upon the person found guilty of a crime, rather than a definition of a particular crime." *State v. James*, 512 P.2d 1031, 1033 (Utah 1973). In contrast, the classification theory refers to a capital offense as "a category of offenses for which the punishment of death might be imposed." *Id.*

¶24 The complexity of this analysis alone indicates that Defendant cannot meet the burden of showing plain error, because any alleged error would not have been obvious to the trial court. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). In making his argument, Defendant cites no precedent expressly declaring that under circumstances like those present in this case, a twelve-person jury is required. And "relief is not available via the plain-error doctrine unless [d]efendants persuade us that the error they allege is supported on the basis of settled law." *State v. Bruun*, 2017 UT App 182, ¶ 33, 405 P.3d 905 (cleaned up).

¶25 And aside from the question of obviousness, Defendant has demonstrated no error. When the State charges an individual with aggravated murder, it must also decide within sixty days of arraignment whether to pursue the charge as a capital felony or a noncapital first degree felony. *See* Utah Code Ann. § 76-5-202(3) (LexisNexis 2017). The case becomes a capital case only if the State seeks the death penalty. *See id.* § 76-5-202(3)(a). In that case, if the individual is convicted, he is sentenced under section 76-3-207 where the possible sentences are death, life without parole, or twenty-five years to life. *See id.* § 76-3-207. But if the State chooses not to seek the death penalty, "aggravated murder is a noncapital first degree felony punishable as provided in Section 76-3-207.7," *see id.* § 76-5-202(3)(b), where the sentencing options are "life in prison without parole" or "an indeterminate prison term of not less than 25 years and that may be for life." *See id.* § 76-3-207.7.

¶26 In the amended information, whereby the State brought the aggravated murder charges against Defendant,[2] the State explicitly stated that it would not seek the death penalty. And

---

2. The first information charged Defendant only with drug and weapons crimes.

under the plain language of section 76-5-202(3)(b), the murder charges were therefore noncapital first degree felonies.[3] Under these circumstances, Defendant has not demonstrated that it was error for the trial court to empanel a jury of eight, rather than twelve, members. Simply put, Defendant has not met his burden of establishing plain error.

B.    Constitutionality of the Aggravated Murder Statute

¶27    Defendant separately challenges the constitutionality of sections 76-5-202(3)(b) and 76-3-207.7 of the Utah Code. He argues that these sections work together "to create a special sentencing provision for an aggravated murder [sentence] where the state does not seek to impose a death sentence on the defendant." The unconstitutionality comes, he claims, because the legislature was "unclear" as to whether it "intended to deprive a defendant of the capital procedural protections that are mandated by both the federal and Utah constitutions." Ultimately, Defendant argues that "the reduction to a non-capital felony essentially strips a defendant of constitutional safeguards, thus creating two separate classes of persons charged with the same crime[, and such] a deprivation of safeguards, and creation of disparate classes, is unconstitutional as applied." As with his earlier contention regarding the mandated size of the jury, Defendant's argument reveals that the constitutional question does not satisfy the strictures of our plain error doctrine. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

---

3. We thus do not reach the question of whether a different outcome would result if the case had been charged as a capital offense and the State thereafter decided not to seek the death penalty.

¶28    Because "it has become settled as a general principle[] that a constitutional question is not to be reached if the merits of the case in hand may be fairly determined on other than constitutional issues," *Hoyle v. Monson*, 606 P.2d 240, 242 (Utah 1980), we instead resolve this issue on the question of obviousness. Where Defendant's challenge is a claim of plain error, he essentially argues that the trial court should have sua sponte determined that the aggravated murder statute was unconstitutional and declared it so. This argument fails under the plain error rubric.

¶29    Defendant has not pointed to any settled law that suggests the aggravated murder statute was unconstitutional in the way he contends. As a result, Defendant has not "persuade[d] us that the error [he] allege[s] is supported on the basis of settled law," and we therefore cannot conclude that any error would have been obvious to the trial court. *See State v. Bruun*, 2017 UT App 182, ¶ 33, 405 P.3d 905. We thus need not reach the question of the constitutionality of the aggravated murder statute because Defendant's plain-error challenge fails on the basis of obviousness.

C.    Waiver of Right to Be Present at Voir Dire

¶30    Defendant next argues that we should reverse because he "was not present for voir dire and had no input in the selection of his jury." He contends that this was problematic because the trial court purportedly did not determine whether Defendant's "waiver of his right to be present for voir dire was made knowingly and voluntarily." Separately, he argues that defense counsel's advice that he waive his right to be present for voir dire was constitutionally ineffective.

1.    Knowing and Voluntary Waiver

¶31    Before the jury was selected, defense counsel informed the court, "It is our intention that we conduct the voir dire in

chambers, that [Defendant] not be present at that. He and I discussed that, and the reasons for that, and I just wanted to make a record that he is in agreement with that procedure." The trial court then clarified with Defendant:

> [Y]ou understand that you have the right to be present at all critical stages in this proceeding, and certainly jury selection is one of those critical stages. So you have the right to be present while the jurors are being questioned as part of the voir dire and part of the jury selection process. Your attorney says that you want to waive your right to be present during jury selection.

The court then asked, "Is that correct?" Defendant responded, "Yes. I trust him." The court accordingly found "that the defendant has knowingly and voluntarily waived his right to be present during the voir dire."

¶32   Later, in the middle of the voir dire process, the trial court explained that it wanted to make sure that it was not "setting [itself] up for ineffective assistance, automatic reversal by the Court of Appeals or the Supreme Court by him not being here." So it brought Defendant into the courtroom and explained there were "just a couple of issues we want to address on the record," with "[o]ne of them [being] that [defense counsel] now says that rather than wait here, that you'd rather go back to the jail, and you don't want to be here for the initial portion of the jury selection when we bring the others in for the next two groups. Is that right?" Defendant responded, "That's correct, sir."

¶33   Despite these two separate attempts to expressly confirm that Defendant truly wished to waive his right to be present at voir dire, Defendant now argues the "record and the circumstances surrounding the waiver, coupled with case law regarding similar waivers, demonstrates that the waiver could

not be knowing and voluntary and the trial court committed plain error." We disagree.

¶34    In making his argument, Defendant encourages us to treat waiver of the right to be present at voir dire no differently than waiver of the right to counsel. He argues, "Similar to the right to counsel, waiver of the right to be present at voir dire can have a devastatingly negative effect on the outcome of the trial." And while we need not reach the question of whether these rights are of equal importance, we cannot conclude that the trial court should have known to treat the rights the same. In other words, we again resolve Defendant's claim of plain error by concluding that any error would not have been obvious to the trial court.

¶35    Defendant essentially contends that waiver of any constitutional right attached to criminal trials requires a detailed colloquy to ensure that the defendant "fully understood the nature of his right . . . and the dangers associated with the waiver." But he does not address constitutional rights that we regularly allow criminal defendants to waive without such a searching inquiry. For instance, we do not require such a colloquy when a criminal defendant waives his right to testify. *See State v. Brooks*, 833 P.2d 362, 365 (Utah Ct. App. 1992) (holding "that the trial court bears no affirmative duty sua sponte to engage in an on-the-record colloquy with defendant at the time of trial to ensure a valid waiver of the right to testify"). Similarly, no detailed discussion is typically held on the record when a defendant waives his rights under the Confrontation Clause. *See State v. King*, 2010 UT App 396, ¶ 51 n.13, 248 P.3d 984 (explaining that "a defendant may waive his constitutional right of confrontation by electing to forgo cross-examination of a witness"). And Defendant directs us to no Utah case law—and we have found none—that explains whether waiver of the right to be present at voir dire is more akin to waiver of the right to testify or confront witnesses or, as Defendant would have us conclude, waiver of the right to counsel. Given the dearth of

relevant authority, it would not have been obvious to the trial court that anything more was required of it. Under these circumstances, we cannot agree that the trial court committed any error, let alone an obvious one.

2.    Advice of Counsel

¶36    Additionally, Defendant argues that defense counsel's advice that he waive his right to be present for voir dire was constitutionally ineffective. To prevail on that claim, Defendant "has the burden of demonstrating (1) that his counsel rendered a demonstrably deficient performance that fell below an objective standard of reasonable professional judgment, and (2) that counsel's performance resulted in prejudice." *State v. Sessions*, 2014 UT 44, ¶ 17, 342 P.3d 738.

¶37    In arguing that defense counsel's advice amounted to deficient performance, Defendant asserts, "There is absolutely no conceivable advantage to advising a defendant against being present at jury selection." But we have previously recognized possible conceivable advantages—defense counsel could have reasonably believed "that the benefits of the client's presence might be outweighed by the risk that potential jurors might be put off by the defendant's appearance or demeanor," *see State v. Martinez-Castellanos*, 2017 UT App 13, ¶ 47, 389 P.3d 432, *cert. granted*, 400 P.3d 1045 (Utah 2017), or that potential jurors would be more candid without Defendant present, *see United States v. Bertoli*, 40 F.3d 1384, 1397 (3d Cir. 1994). Because he does not address these potential rationales for defense counsel, Defendant has not shown that the advice "fell below an objective standard of reasonable professional judgment." *See Sessions*, 2014 UT 44, ¶ 17. As a result of Defendant's failure to show deficient performance, we need not reach the issue of prejudice. *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232. Accordingly, we affirm as to Defendant's waiver of his right to be present at jury voir dire.

II. Sufficiency of the Evidence

¶38 We next consider Defendant's contention that his convictions for aggravated murder were not supported by sufficient evidence. He specifically argues that the evidence failed to prove he intentionally or knowingly caused Girlfriend's death and that the evidence failed to disprove Defendant killed Friend in self-defense. We will not disturb a jury verdict unless "the evidence and all inferences which may reasonably be drawn from it," when viewed "in the light most favorable to the verdict," are "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94.

A.      Girlfriend

¶39 For the jury to have convicted Defendant of aggravated murder for Girlfriend's death under the facts of this case, it must have found beyond a reasonable doubt that Defendant "intentionally or knowingly cause[d] the death of" Girlfriend, and that "the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons were killed." *See* Utah Code Ann. § 76-5-202(1)(b) (LexisNexis 2017).[4] Defendant contends that the jury could not have properly so found because he "believed the firing chamber in [his] gun was unloaded" and thus he "lacked intent to shoot and kill" his victims. In so arguing, he directs our attention to *State v. Ricks*, 2013 UT App 238, 314 P.3d 1033, in which the defendant was convicted of depraved indifference murder. *See id.* ¶ 17. He argues that because his mental state

---

4. For obvious reasons, Defendant challenges only the evidence supporting the finding that he possessed the requisite mens rea for the crime.

matched that of the *Ricks* defendant, the evidence was insufficient to support a more culpable mental state, such as intentional or knowing. We are not persuaded.

¶40 In the present case, the jury heard evidence that Defendant pointed his gun at Girlfriend's head. And while the *Ricks* court considered a factually similar case, in that the defendant held a gun to the victim's head and claimed to believe a round was not chambered, *see id.* ¶ 2, that court did not consider whether the defendant's conduct might have also been sufficient to support a finding of intentional or knowing conduct. Said another way, simply because the *Ricks* court decided conduct similar to the conduct at issue here was sufficient to support a conviction for depraved indifference murder, *see id.* ¶¶ 2, 17, that does not mean that the conduct could not also support a conviction requiring a different mental state.

¶41 Indeed, here, the jury heard evidence sufficient to allow it to find that Defendant knowingly or intentionally killed Girlfriend. Defendant had owned his gun for twenty-eight years. And unlike the gun involved in *Ricks*, Defendant's gun was a revolver. The State presented expert evidence regarding the simplicity of knowing which cylinders were loaded, given that the rim of the cartridge protrudes slightly out of and above the cylinder. By Defendant's own account, under these circumstances, he pointed the gun—which Defendant would have easily seen was loaded—at Girlfriend's head and pulled the trigger. This evidence alone might be sufficient to support the jury's finding that he intentionally or knowingly caused Girlfriend's death. But we need not decide that because the jury heard additional evidence of Defendant's mental state.

¶42 For instance, evidence was presented that Defendant failed to call 911 after shooting Girlfriend and instead shot a second victim, Friend. Additionally, Defendant misled police

about what had happened and was calm when talking to Daughter. He also left the scene of the crime, wrote a note to his mother under the apparent belief that he would be going to prison, and proclaimed a plan to commit suicide. All of this evidence supports a conclusion that the shooting was not an accident. We accordingly will not disturb the jury's verdict of aggravated murder for Girlfriend's death.

B.    Friend

¶43    Defendant also challenges the sufficiency of the evidence supporting his conviction of aggravated murder for Friend's death, arguing that he shot Friend in self-defense. The jury received a self-defense instruction based on Defendant's assertion that he had felt the need to protect himself against Friend.

¶44    "When there is a basis in the evidence, which would provide some reasonable basis for the jury to conclude that the defendant acted to protect himself from an imminent threat, . . . the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Lucero*, 2012 UT App 202, ¶ 6, 283 P.3d 967 (cleaned up). Defendant claims that the State's "only attempt" to rebut his claim of self-defense came during closing argument. But that is not the case.

¶45    For Defendant to have been justified in shooting Friend in self-defense, he must have believed that his action was "necessary to prevent death or serious bodily injury." *See* Utah Code Ann. § 76-2-402(1)(b) (LexisNexis 2017). But by Defendant's own account, he knew Friend had no weapon. And although Defendant told police that Friend "loved to fight," he also admitted that he and Friend had never fought each other. Moreover, according to Defendant's explanation of events, Friend only started up out of his seat after Defendant had shot Girlfriend.

¶46    Under these circumstances, we will not second-guess the jury's determination that Defendant, in twice shooting the unarmed Friend, did not act in self-defense.

### III. Ineffective Assistance of Counsel

¶47    Separate from the issue of his attendance at jury voir dire, Defendant argues that defense counsel provided ineffective assistance for two additional reasons. First, Defendant claims that defense counsel failed to investigate or call witnesses. Second, he claims that defense counsel should have moved to sever the various charges at trial.

### A.    Failure to Investigate or Call Witnesses

¶48    Defendant's first claim on this issue is that defense counsel "did not investigate potential witnesses on behalf of the defendant and was therefore ineffective." But Defendant provides no record evidence to support this claim. And the evidence that is available in the record flies in the face of this assertion. For instance, the record reveals that the court appointed an investigator to assist with Defendant's case, and that the investigator sat with defense counsel during trial.

¶49    Without developing a record of what defense counsel did or did not use the investigator for, Defendant cannot demonstrate that defense counsel's decisions were unreasonable—and we cannot review such decisions without knowing what they were. Indeed, our rules contemplate situations where a record might need to be developed to support a claim of ineffective assistance of counsel. *See* Utah R. App. P. 23B. Defendant does not seek a rule 23B remand or demonstrate that one would be proper here. We therefore conclude that Defendant has not shown defense counsel performed deficiently. And "it is not necessary for us to address both components of the [ineffective-assistance] inquiry if we determine that a

defendant has made an insufficient showing on one." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (cleaned up).

B.      Failure to Sever

¶50     Defendant's final claim on appeal is that defense counsel was ineffective for not moving to sever the drug-related charges from the aggravated murder charges. This claim fails because the record demonstrates that this decision was strategic. Defense counsel used the drug-related evidence to strengthen Defendant's claim that the shooting was an accident, arguing that if Defendant had not been under the influence of drugs, he would not have shot Girlfriend.

¶51     Specifically, defense counsel presented evidence that methamphetamine impairs judgment and thought processes. He presented Defendant's statement that he would not have fired the gun if he had not used drugs. And such "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). As the State points out, the fact that this strategy was ultimately unsuccessful is irrelevant. *See State v. Ott*, 2010 UT 1, ¶ 34, 247 P.3d 344. We thus reject Defendant's claim of ineffective assistance of counsel.

CONCLUSION

¶52     We affirm Defendant's convictions for aggravated murder. He has not demonstrated error regarding his absence from jury voir dire, the number of jurors empaneled, the sufficiency of the evidence against him, or defense counsel's performance.

¶53     Affirmed.

_____